THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERSCHELL ANDREWS, Plaintiff in Error.

*Opinion filed October 22, 1927.*

1. CRIMINAL LAW—*when inexperience of counsel will not require reversal.* The fact that an additional counsel appointed at the request of the defendant was not experienced in the trial of criminal cases will not require a reversal where it does not appear that the defendant's rights were prejudiced by reason of the inexperience of said counsel.

2. SAME—*when evidence of general threat to kill is admissible.* While testimony tending to show a willingness to commit other distinct crimes is not admissible in a prosecution for murder where self-defense is interposed, a witness may be permitted to state that the defendant threatened on the day of the homicide to "kill somebody before night," and that as he was leaving the place where the homicide was committed he said, "I will kill every ———— nigger in there," as such evidence, while it does not show malice toward the victim of the homicide, has probative value in showing a design to kill, refutes the defense of self-defense, and tends to show the defendant's state of mind at the time of the offense.

3. SAME—*when counsel cannot complain of improper evidence.* Where counsel for the defense brings out incompetent evidence on cross-examination and makes no effort to disclaim it he cannot afterwards complain of the error.

4. SAME—*when knife is admissible in murder trial.* In a prosecution for murder committed by stabbing, which the defendant admits but interposes self-defense, a knife which several witnesses testify to be the one used by the defendant, and which the defendant says looked like the one he used, may be admitted in evidence.

5. SAME—*the trial court may reasonably limit extent of cross-examination.* So far as the cross-examination of a witness relates either to facts in issue or to facts relevant to the issue it may be pursued as a matter of right and counsel need not be confined to the precise phases of a subject introduced on direct examination, but the cross-examination should be kept within fair and reasonable limits and the extent to which it may go is largely within the trial court's discretion.

6. SAME—*when instructions defining malice are not erroneous in ignoring the defense.* The prosecution is entitled to proper instructions which present its theory of the case even though they have no application to the case on the theory of the defense, and

instructions defining malice in a murder trial cannot be called erroneous as ignoring the defense of self-defense where they do not attempt to direct a verdict and where other instructions cover the law of self-defense.

· 7. Same—*what question is raised when self-defense is interposed.* Where self-defense is interposed the question for the jury is whether the facts as they appeared to the defendant when he committed the homicide and under conditions there present were such as to indicate to him, as a reasonable person, an intent to take his life or to do him great bodily harm.

8. Same—*when instruction as to self-defense is not misleading.* Where the jury are properly advised by other instructions as to the law of self-defense and as to what question must be determined by them when such defense is set up, an instruction, applicable to the facts, that self-defense does not imply the right of attack in the first instance is not misleading because it concludes that if the jury "believe from the evidence, beyond a reasonable doubt, that he [the defendant] stabbed and killed at a time when he had no reasonable cause to apprehend the approach of immediate or impending injuries to himself, and did so from a spirit of utter disregard of human life, * * * then the defendant can not avail himself of the law of self-defense."

9. Same—*what instruction as to use of force in self-defense is proper.* Where there is evidence to support the theory of the prosecution that the defendant was the aggressor, the jury may be instructed that while the defendant, acting under a necessity apparent to him, may use force in self-defense, yet if the force used is carried beyond the point of such apparent necessity for the protection of life or to prevent great bodily harm, then it may in its turn constitute an assault which is unlawful and criminal.

10. Same—*when instruction as to intoxication affecting penalty to be imposed may be refused.* The refusal of an instruction that in determining the penalty to be imposed the jury may take into consideration evidence of the intoxication of the defendant at the time of the homicide is not prejudicial where the defendant claims the homicide was committed in self-defense and not that he did not know or appreciate what he was doing at the time.

11. Same—*only material allegations of an indictment need be proved—instruction.* Only the material, and not all, allegations of an indictment need be proved beyond a reasonable doubt, and the court may refuse an instruction for the defendant that the allegations of the indictment must be proved beyond a reasonable doubt and that the fact that a person has been indicted and is on trial is not evidence of guilt, as the court is not required to modify or correct the instruction.

12. SAME—*when an instruction that jury are judges of the law may be refused.* An instruction that the jury are the judges of the law as well as the facts and that they are not bound by the court's opinion of the law may be refused, where it omits the qualification that the jurors must, upon their oaths, consider that they know what the law is, and must be prepared to say, under all the circumstances, that the court is wrong in its exposition of the law.

13. SAME—*when illness of juror will not require new trial.* The fact that on the last day of the trial one of the jurors became ill, and that a physician, summoned by consent of counsel, suggested that a recess be taken until the afternoon but stated that the juror could continue to participate in the trial, does not afford ground for a new trial although no recess was taken, where it is not shown that the juror's indisposition interfered with the orderly progress of the trial or proper deliberation by the jury.

WRIT OF ERROR to the Circuit Court of Champaign county; the Hon. FRANKLIN H. BOGGS, Judge, presiding.

GEORGE W. McCASKRIN, and FORREST B. GORE, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROY R. CLINE, State's Attorney, VIRGIL L. BLANDING, and G. C. HODSON, for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Herschell Andrews was indicted in the circuit court of Champaign county for the murder of Thomas Tate. A jury trial resulted in a verdict finding Andrews guilty and fixing his punishment at death. Motions for a new trial and in arrest of judgment were denied and judgment was rendered and sentence of death pronounced. Andrews was allowed this writ of error, and he prosecutes it to review the record.

The plaintiff in error is a negro, about thirty-five years of age. He has a family, and his home is in Indianapolis, Indiana. At the time of the homicide he had lived in the city of Champaign about three months and had been em-

ployed first on the Illinois Central railroad and later on an
interurban railroad. Thomas Tate, the decedent, was also
a colored man, and he was from sixty to sixty-five years
of age. The death of Tate resulted from a stabbing which
occurred late in the afternoon of Christmas day, 1926, in
a restaurant conducted by Howard Quinn in a two-story
brick building located at 704 North Fourth street, in Cham-
paign. The building faces west, and its length is 42½ feet
and its width is 27 feet. On the first floor a beaver-board
partition extends from front to rear at the center of the
building. North of this partition is a pool room, contain-
ing three pool tables. The south half of the first floor is
occupied by the restaurant, which consists of a dining room
at the west or front and a kitchen to the east or rear. North
of and parallel to the south wall of the dining room is a
counter. Near the northeast corner of the dining room
stands a stove. There is no front door from the street to
the pool room but access to it is gained through a door in
the partition between the dining room and the pool room.
This door is located about ten feet east of the front of the
building. The second floor was occupied by LeRoy Barnes
as a barber shop, club room and dance hall, and lunches
and beverages were served there until the establishment
was closed by the police. At the time of the homicide
there were present in the restaurant, besides plaintiff in
error and the decedent, several persons who were engaged
in general conversation. The evidence on the part of the
prosecution is to the effect that at some time after four
o'clock in the afternoon Tate was sitting near the stove in
the dining room of the restaurant when plaintiff in error
entered and took a seat near him. Plaintiff in error either
asked Tate what he had told the police or stated that Tate
had talked to the police about him. Some of the witnesses
did not hear Tate make an answer, while others testified
that he denied talking to the police, whereupon plaintiff in
error replied, "Yes, you have," jumped up, took a knife

from his pocket and stabbed Tate. The latter arose from
his seat and backed toward the counter, plaintiff in error
in the meantime advancing upon and stabbing him. Tate
made his way into the pool room, where he staggered and
fell against the beaver-board partition, about four feet east
of the door between the pool room and the restaurant.
The partition was broken by the fall and Tate's head and
arms protruded through to the restaurant side. When Tate
fell plaintiff in error ordered him to arise, and, uttering
an oath, said that he would "cut his throat" or "cut his
head off." Plaintiff in error then started toward the door,
drew his fingers over the knife blade to remove the blood,
wiped the blade on his trousers and put the knife in his
pocket. He reached the front door about the time Barth
Clay entered. Clay asked, "What is the matter with you
fellows?" and plaintiff in error answered, "I will kill every
————————— nigger in there." After leaving the restaurant
plaintiff in error met Charles Jackson on the track of the
Wabash railroad and said to him, "I think I killed old man
Tate down there; I wish you would go and see and come
back and let me know," adding that he would be at 610
Vine street. Plaintiff in error first stopped at Rufus Slay's
house, near the restaurant, and then went to the home of
H. K. Whitaker, at 610 Vine street. Jackson had called
the police officers and plaintiff in error was arrested at
Whitaker's house. Tate's body was removed to an un-
dertaking establishment, where an examination was made
by the coroner, which disclosed ten knife wounds, one of
which severed the carotid artery.

Plaintiff in error testified that on a prior occasion, when
three or four persons attacked him, he and Tate had
trouble, and that later Tate said to him, "There is coming
a time when I will get you for it;" that he, plaintiff in er-
ror, spent the evening of December 24, and the night that
followed, with the exception of three and one-half hours,
on the second floor of the building in which the restaurant

is located; that while there he drank intoxicating liquors and played cards with other persons; that in the morning he went to the restaurant down-stairs and found three or four men, including Tate and Barnes, present; that Barnes, pointing to plaintiff in error, said, "That fellow there was the cause of Chief Keller locking my place up;" that plaintiff in error denied the charge, and Barnes answered that some person had told the chief of police; that when plaintiff in error began to tell him who had given the information, Barnes said, "If I was Tate I would get me a gun and shoot you in the mouth;" that Tate then remarked, "That is all right; I will get him;" that later plaintiff in error and Charles Goodhall left the restaurant and obtained some whiskey and drank it; that he borrowed the knife with which he did the stabbing from Goodhall; that he returned to the restaurant, met Joe Brown there, and later went to the home of one Strothers, where he drank intoxicating liquors, and that he left Strothers' house about two or three o'clock, walked about the streets, and returned to the restaurant shortly after four o'clock in the afternoon. His version of the stabbing is, that after entering the restaurant he sat near the counter, and in about five minutes Tate came in and accused him of turning informer to the police; that plaintiff in error denied the charge, and Tate answered, "Well, I will get you; I will fix you right now;" that Tate, who was taller and heavier than plaintiff in error, started to put his hand in his pocket, whereupon plaintiff in error, believing it was necessary to act in self-defense, took the knife from his pocket and stabbed him; that he was afraid of Tate and if he could have reached the front door he would not have stabbed him; that he believed that his act was necessary in self-defense and that he was partially intoxicated at the time. Plaintiff in error denied that he said anything to Tate after the latter fell against the partition in the pool room or that he told Jackson that he killed Tate. He admitted that he said to Barth

Clay, upon leaving the restaurant, "I ought to kill every ———— nigger that was in that ———— place."

The testimony of plaintiff in error that Tate was the aggressor at the time of the stabbing, and that he, plaintiff in error, was then intoxicated to some extent, was not corroborated by any witness. Barnes denied that he said, in Tate's presence, that if he were Tate he would shoot plaintiff in error in the mouth, and he testified that on the morning of Christmas day, when Tate, plaintiff in error and the witness were in the restaurant, Tate said nothing to plaintiff in error. Several witnesses testified that when the stabbing occurred plaintiff in error did not appear to be intoxicated.

Plaintiff in error contends that there is a variance between the indictment and the proof with respect to the name of the person alleged to have been killed. The indictment charged the murder of Thomas Tate. One of the first questions asked the first witness for the prosecution was whether he had been acquainted with Thomas Tate, and he answered in the affirmative. Later in the introduction of evidence the decedent was referred to as Thomas Tate. The prosecution did not fail to prove the full name of the decedent.

Because additional counsel inexperienced in the trial of criminal cases was appointed to assist in the defense of plaintiff in error it is contended that his rights should be guarded with especial care. Plaintiff in error was represented by an attorney and it was upon his request that the court appointed additional counsel. Additional time was given to prepare the defense, and when the case was called for trial counsel for plaintiff in error announced that they were ready. The present case differs substantially from *People* v. *Blevins*, 251 Ill. 381, in which three able and experienced lawyers, employed and compensated by third parties, assisted the State's attorney in the prosecution, the defendant was represented by inexperienced counsel and

evidence of a highly prejudicial character was introduced by the State; and from *People* v. *Schulman,* 299 Ill. 125, where the evidence to sustain a conviction was doubtful, and the defendant was deprived of valuable impeachment evidence because his counsel was ignorant of the proper method of laying the foundation for its introduction. It does not appear that the rights of plaintiff in error were prejudiced by reason of the inexperience of one of his counsel. Even if it could be said that he was not as skillfully defended as he might have been, that fact would not justify a reversal of the judgment. *People* v. *Barnes,* 270 Ill. 574; *People* v. *Anderson,* 239 *id.* 168; *People* v. *Schulman, supra.*

It is contended that prejudicial error was committed in the admission of certain testimony offered by the prosecution. Joe Brown testified that before the fatal stabbing plaintiff in error said "he bet he would kill somebody before night." Plaintiff in error objected to the statement and moved that it be stricken out. The motion was overruled and the answer was permitted to stand. The threat was not evidence of malice toward the decedent but it had some probative value in showing a design to kill. (1 Wigmore on Evidence,—2d ed.—secs. 102, 103; 3 *id.* sec. 1732; *People* v. *Folignos,* 322 Ill. 304.) It would also have some probative value in refuting the defense of self-defense and was admissible for that purpose. *Lyons* v. *People,* 137 Ill. 602.

Complaint is likewise made of the testimony that plaintiff in error, as he left the restaurant immediately after the stabbing, said, "I will kill every ——— nigger in there." Plaintiff in error admitted that he said he "ought to kill every ——— nigger that was in that ——— place." Testimony tending to show a willingness to commit other distinct crimes is not admissible. (*Turley* v. *People,* 188 Ill. 628.) The statement attributed to plaintiff in error, however, was made immediately after the stabbing, it would

tend to show the state of his mind in the heat of the stabbing, and it had probative value for that purpose. (3 Wigmore on Evidence,—2d ed.—pp. 714, 715.)

A police officer testified that after plaintiff in error was arrested, and when he was on his way to the police station, he called to some person across the street and said, "I'll settle with you in '49." On objection by the plaintiff in error this testimony was promptly stricken out, and it affords him no basis for complaint.

Gus Brown, a witness for the prosecution, was asked what plaintiff in error said before the homicide occurred with reference to the knife in his possession, and his answer was, "Well, he said he would have it and if LeRoy Barnes would fool with him he would kill him." The answer was first permitted to stand but was later stricken. Plaintiff in error contends that the harm was done before the court overruled the objection and that the resulting prejudice was not obviated by the change in ruling. The reversal of the court's ruling followed almost immediately after the answer was given and was accompanied by the statement, "What he was going to do to Barnes will be stricken." The promptness with which this ruling and statement were made prevented misunderstanding on the part of the jury. On cross-examination of the witness another reference to the statement of plaintiff in error concerning Barnes and that he was going to "stab both of his eyes in one" was elicited and no objection was made to this testimony. The answer was made to a question by counsel for plaintiff in error. Where counsel for the defense brings out incompetent evidence on cross-examination and makes no effort to disclaim it he cannot afterwards complain of the error. *People v. Maciejewski,* 294 Ill. 390.

It is objected that there were repeated attempts on the prosecution's part to place before the jury evidence that plaintiff in error intended to harm persons other than the decedent, and that these attempts could not fail to be preju-

dicial to plaintiff in error. A reference to the direct examination of the prosecution's witnesses discloses that the only testimony of this character, other than the instances already considered, was that of a police officer, who testified that on Christmas morning plaintiff in error had a quarrel with Barnes. No objection was made to this statement, and the contention is without merit.

It is further contended that it was error to admit the knife in evidence. Several witnesses testified to its identity. Plaintiff in error not only admitted the stabbing but also that the knife in evidence looked like the one he had used. In this situation there was no error in the admission of the knife.

Plaintiff in error, it is argued, was unduly restricted in the cross-examination of the prosecution's witnesses. Complaint is made that seventeen questions were improperly excluded. It is unnecessary to discuss each of these questions separately. A question was asked on the cross-examination of the first witness for the prosecution whether he had been drinking intoxicating liquor the night before the homicide. The court inquired of counsel for plaintiff in error, out of the jury's presence, whether in asking the question he intended to show that the witness was so intoxicated that it affected his ability to observe what occurred, and upon counsel's statement that such was his purpose he was permitted to ask the question. The witness answered the question in the negative. In a number of other instances, pursuant to the express offer of the defense to show that the intoxication of the witness affected his ability to see what had transpired, the court permitted the offered testimony to go to the jury. So far as this subject was concerned there was no unwarranted restriction of the right to cross-examine.

Questions were also asked, on cross-examination, whether Tate, the decedent, had been addicted to the use of intoxicating liquor; whether the witness interrogated

had ever seen plaintiff in error intoxicated; whether plaintiff in error had been drinking intoxicating liquor at seven or eight o'clock on Christmas morning; and whether the witness was sober or intoxicated at that time. Answers to these questions would have no bearing upon the issue, and there was no improper restriction of the cross-examination in excluding them.

In the cross-examination of Barnes, a witness called by the prosecution, objections to the following questions were sustained by the court: Why Barnes stopped running his business; who told Quinn that plaintiff in error had caused Barnes' place of business to be closed; whether Bertha Roy was present in his place at a certain time; whether he, Barnes, discussed his feelings toward plaintiff in error with any person except Quinn; whether plaintiff in error in fact made a report to the police about Barnes' place; whether Barnes knew plaintiff in error was the cause of having his business closed; and to whom Barnes made reference when he said that he told everybody that plaintiff in error caused his place of business to be closed. Plaintiff in error does not show wherein he was prejudiced by the refusal of the court to allow these questions to be answered. Answers to them would shed no particular light upon the question at issue. So far as the cross-examination of a witness relates either to facts in issue or to facts relevant to the issue it may be pursued as a matter of right and counsel need not be confined to the precise phases of a subject introduced on direct examination. (*Spohr* v. *City of Chicago,* 206 Ill. 441; 5 Jones' Commentaries on Evidence,—2d ed.—p. 4585.) The cross-examination should be kept within fair and reasonable limits, and the extent to which it may go is largely within the trial court's discretion. (*People* v. *Harris,* 263 Ill. 406; *People* v. *Strauch,* 247 id. 220.) No abuse of that discretion appears, and the court did not err in sustaining objections to these questions.

The further contention is made by plaintiff in error that evidence offered in his behalf which would have tended to show a conspiracy was improperly excluded. Plaintiff in error called Quinn, the proprietor of the restaurant, as a witness, and in the course of his examination asked whether plaintiff in error and Tate had previously quarreled in the restaurant. Upon objection by the State, counsel for plaintiff in error stated that he expected to show a conspiracy on the part of certain witnesses who had testified and that it was important to show the relations between the parties. The court stated that plaintiff in error had the right to show that the decedent had made threats against him provided it appeared that at the time of the homicide there was some overt act on the decedent's part tending to show that he was about to assault plaintiff in error. The order of proof to show a conspiracy is largely discretionary with the trial judge. (*Spies* v. *People,* 122 Ill. 1.) Plaintiff in error was not prevented from showing a conspiracy if one existed. There was no testimony to the effect that the decedent was the aggressor and that plaintiff in error acted in self-defense, other than that of plaintiff in error himself. After he testified no further attempt was made to establish a conspiracy. Among the facts which plaintiff in error claims point toward a conspiracy are: That Tate was not well known, that the persons present at the time of the homicide cared little about him because no assistance was offered him while the stabbing occurred, and that no physician was called. These facts show that the persons present lacked the ordinary humane qualities, but they are not on that account evidence of a conspiracy.

Plaintiff in error sought to show the character of the business conducted at 704 North Fourth street as well as the reputation of the place, but the court, upon objection, excluded the offered testimony. However disreputable the business or ill the repute of the place, these facts, if estab-

lished, would make no difference in the effect of the act committed by plaintiff in error.

A plat of the first floor of the building showing the equipment of the restaurant was offered by plaintiff in error. The court excluded it on the ground that it contained evidentiary matters, and complaint is made of the ruling. A considerable interval of time elapsed between the stabbing and the making of the plat. Even if the plat would have aided the jury in understanding the surroundings at the time of the killing, its admission in evidence was not a matter of right. An improbability in the testimony of a witness could have been shown without the plat. Its exclusion was not prejudicially erroneous.

Error is assigned upon the giving of certain instructions requested by the prosecution. The second and third instructions, it is said, ignore the defense of self-defense and are for that reason erroneous. These instructions define malice and neither attempted to direct a verdict. The prosecution is entitled to instructions which present its theory of the case, and where instructions state correct propositions of law they may be given although they have no application to the case on the theory of the defense. (*People v. Grant,* 313 Ill. 69; *People v. Priddy, ante,* p. 50.) The People's instructions were offered as a series. Other instructions given at the request of the People and plaintiff in error covered the law of self-defense.

The fourth instruction, plaintiff in error argues, is erroneous. The instruction is as follows:

"The court instructs the jury that the law of self-defense does not imply the right of attack in the first instance, nor does it permit of action done in retaliation or for revenge. Therefore, if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant sought or brought on a difficulty with the deceased at the time of the stabbing, or if you believe from the evidence, beyond a reasonable doubt, that he stabbed and killed at a

time when he had no reasonable cause to apprehend the approach of immediate or impending injuries to himself, and did so from a spirit of utter disregard of human life, or from a motive of revenge or retaliation, then the defendant cannot avail himself of the law of self-defense and you cannot acquit on that ground."

The first sentence in the instruction is a correct statement of the law where there is evidence in the record, as is true in the instant case, that the accused person was the aggressor. (*People* v. *Battaglia,* 282 Ill. 91.) The rest of the instruction, it is argued, was likely to mislead the jurors to believe that they were to decide whether there was reasonable cause for the apprehension stated. The question for the jury to determine was whether the facts as they appeared to the defendant at the time of the commission of the homicide and under the conditions there present were such as to indicate to him, as a reasonable person, an intent to take his life or to do him great bodily injury. (*People* v. *Duncan,* 315 Ill. 106; *People* v. *Stapleton,* 300 id. 471.) At the instance of plaintiff in error the court gave several instructions upon the law of self-defense. Among these instructions, the eleventh told the jury that if the decedent made an assault on the defendant, and the latter, under the circumstances shown by the evidence, honestly believed he was in actual danger of losing his life or of suffering great bodily harm, he was justified in defending himself, although the danger was not, in fact, real but only apparent to the defendant under the circumstances in which he was then placed, and that he should not be held criminally responsible if he acted in self-defense from real and honest convictions as to the character of the danger although he may have been mistaken as to the extent of the actual danger. His thirteenth instruction informed the jury that if they believed from the evidence that the defendant was assaulted by the decedent in such a way as to induce in the defendant a reasonable belief

that he was actually in danger of losing his life or of suffering great bodily harm, then he was justified in defending himself whether the danger was real or only apparent; that actual or positive danger is not indispensable to justify self-defense; that the law considers that a man, when threatened with danger, is obliged to judge from appearances and to determine therefrom as to the actual state of things surrounding him, and that in such a case if a person acts from honest convictions induced by reasonable evidence he will not be held responsible criminally for a mistake as to the extent of the actual danger. In view of these instructions the jury could not have been misled by the fourth instruction given at the instance of the prosecution.

The fifth instruction is criticised. It stated that the defendant, while acting under a necessity apparent to him, may use force in self-defense, yet if the force used is carried beyond the point of such apparent necessity for the protection of life or to prevent great bodily harm, then it may in its turn constitute an assault which is unlawful and criminal. A similar instruction was approved in *People* v. *Battaglia, supra.* The theory of the State was that plaintiff in error was the aggressor. There was evidence to support that theory, and the giving of the instruction was justified.

Plaintiff in error complains of the modification of two instructions which he tendered. The first related to the punishment which might be inflicted, and as tendered contained the statement "that while the statute recognizes no degree in the crime of murder, yet by providing such a wide range of punishment, it clearly recognizes the fact that the crime may be committed under circumstances manifesting different degrees of turpitude." The court eliminated this statement. The instruction as tendered and modified told the jury that "the design of the statute is that the punishment shall be proportioned to the turpitude of the offense." The part eliminated was argumentative

and a repetition of what the instruction already contained. The other modified instruction, when presented, told the jury that malice aforethought is an essential element of the crime of murder; that the prosecution must prove such malice beyond all reasonable doubt, and that if the prosecution fails so to prove "such deliberation" the defendant must be found not guilty of murder. Failure to prove such "deliberation" was changed to failure to prove "that defendant acted with malice aforethought." Nothing essential to the rights of plaintiff in error in the tendered instruction was omitted from the modified instruction. The modifications made in the two instructions were in no way prejudicial to plaintiff in error.

Complaint is also made of the court's refusal to give certain instructions requested by plaintiff in error. Instruction No. 3 informed the jury that in order to determine the punishment intelligently they might take into consideration the evidence concerning the intoxication of the defendant at the time of the homicide. Plaintiff in error claims that he stabbed Tate in self-defense, and not that he did not know or appreciate what he was doing when the homicide occurred. The refusal of the instruction was not prejudicially erroneous.

The fourth refused instruction contained the statements that the allegations of the indictment must be proved beyond a reasonable doubt, and that the fact that a person has been indicted for murder and is on trial upon that charge is not evidence of guilt. Only the material, and not all, allegations of an indictment need be proved beyond a reasonable doubt. (*People* v. *Preble,* 316 Ill. 233.) The instruction was also erroneous in other respects. The trial court is not obliged to re-write an erroneous instruction. (*People* v. *Bermingham,* 301 Ill. 513.) The instruction was properly refused.

Refused instruction No. 10 was that the jury are the judges of the law as well as the facts in the case, and that

327—12

they are not bound by the court's opinion in respect of the law. The jury are the judges of the law in a criminal case if they upon their oaths consider that they know what the law is, and are prepared to say, under all the circumstances, that the court is wrong in its exposition of the law. Omitting this qualification the instruction was properly refused. *People* v. *Maruda,* 314 Ill. 536.

Other refused instructions had no basis in the evidence and hence were properly refused. Still other instructions requested by plaintiff in error correctly stated applicable rules of law but were mere repetitions of given instructions. It is not necessary to give such repetitious instructions. *People* v. *Dear,* 286 Ill. 142; *People* v. *Cash,* 326 id. 104.

The given instructions, it is argued, failed to present to the jury the proposition that if the evidence raised a reasonable doubt whether plaintiff in error acted in self-defense the verdict must be not guilty. Several instructions upon the law of reasonable doubt and self-defense were given. The fifteenth instruction given at the instance of plaintiff in error is as follows:

"The jury are instructed that if the proof on the part of the prosecution in this case, though clearly establishing a homicide, leaves a reasonable doubt in the minds of the jury as to whether the killing was murder or manslaughter, or as to whether the defendant was justified or excused in committing the homicide, the defendant is entitled to the benefit of that doubt and can only be convicted of the lesser offense or be acquitted."

This instruction, with the others, taken together, fully informed the jury that plaintiff in error was entitled to an acquittal if upon the whole evidence a reasonable doubt whether he acted in self-defense was raised.

Finally, it is contended that a new trial should have been granted because the illness of a juror may have hastened the return of the verdict. At the close of the open-

ing argument to the jury by the assistant State's attorney on the forenoon of the last day of the trial one of the jurors became ill and with the consent of plaintiff in error a physician was summoned. In the presence of counsel for the prosecution and defense the physician stated that the juror was ready to continue to participate in the trial but suggested that a recess be taken until afternoon. No recess was taken, the juror attended luncheon with the other jurors and later occupied his seat throughout the rest of the trial. The jury retired between four and five o'clock and returned the verdict about 7:30 P. M. The contention is not that the juror's illness actually hastened the verdict but only that it may have had that effect. It does not appear that the juror was disabled in any respect from performing his duties. He heard all the arguments, deliberated with his fellow-jurors until the verdict was reached, and when the jurors were polled he answered that the verdict was his. No fact or circumstance is shown from which it may be inferred that the juror's slight illness during the forenoon hastened or in any way affected the verdict. The facts are essentially different from those in *People* v. *York*, 262 Ill. 620, upon which plaintiff in error relies. In this case the juror's brief indisposition did not interfere with the orderly progress of the trial or proper deliberation by the jury and it afforded no ground for a new trial. *Hughes* v. *People*, 116 Ill. 330; *Baxter* v. *People*, 3 Gilm. 368.

The judgment of the circuit court of Champaign county is affirmed. The clerk of this court is directed to enter an order fixing the period between sunrise and sunset on Friday, the sixteenth day of December, 1927, as the time when the original sentence of death entered in the circuit court of Champaign county shall be executed. A certified copy of that order will be furnished by the clerk of this court to the sheriff of Champaign county.

*Judgment affirmed.*