THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BERNICE SCHOMER, Defendant-Appellant.

Third District   No. 77-181

Opinion filed September 29, 1978.

Robert Agostinelli and Gary R. Garretson, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Keefe, State's Attorney, of Rock Island (James E. Hinterlong and Joseph A. Mueller, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Bernice Schomer appeals from a judgment of the Circuit Court of Rock Island County, in which she was convicted of solicitation to commit murder, following a jury trial. She was sentenced to a term of 10 to 30 years in the penitentiary.

On appeal in this court, defendant asserts that she was denied a fair trial when the State was permitted to cross-examine a defense witness concerning the prior request of that witness for immunity before the grand jury. It is contended by defendant that the prior request for immunity had no impeachment value and that prejudice resulted from its admission into evidence. Defendant also contends that the trial court misconceived the limits of his discretion in sentencing the defendant. The record in this case indicates that late in 1976, defendant Bernice Schomer and Anthony Sanchez, her son, were charged by information with murder and conspiracy, as a result of the shotgun murder on December 11, 1974, of William Cotton in Rock Island, Illinois. The information against the defendant Schomer was later amended to include the charge of "solicitation to commit murder" for which she was ultimately convicted. Schomer and Sanchez were tried jointly on the charges in March 1977.

At the trial, the State presented evidence establishing that William Cotton was shot to death with a shotgun outside his apartment in the early morning hours of December 11, 1974. Evidence recovered from the scene included a spent shotgun shell, wadding from a shotgun shell and shotgun shell pellets. The principal witness against both Sanchez and Schomer was Dewayne Mark Cunningham, who was an accomplice in the murder, and who had been granted immunity in return for his testimony. The testimony of Cunningham established that two days prior to the murder, the victim, William Cotton, had been involved in a dispute with one Bernadette Kiel at the home of Anthony Sanchez. Kiel was living with Sanchez at the time. The substance of the dispute concerned money which was owed to Cotton by Kiel and the dispute terminated with Cotton being driven from the home at gunpoint by Schomer. Witness Cunningham had overheard a conversation between defendant Schomer and Anthony Sanchez in which Schomer had told of the circumstances of the dispute to Sanchez and told Sanchez that if he didn't kill Cotton, she would.

Cunningham also testified that on December 10, 1974, Sanchez stated to Schomer that he, Sanchez, was going to "take care" of Cotton that night. Schomer responded, according to Cunningham, by telling Sanchez to take care of everything and to make sure that Cotton didn't talk. Sanchez then told Schomer that he needed some shells. Schomer said she might have a couple of shells in her house. Sanchez, Schomer, and Cunningham then drove to Schomer's house and Sanchez and Schomer entered the kitchen area. When they returned from the kitchen, Sanchez carried a 12-gauge shotgun shell which he showed to Cunningham. Schomer, at that time, then

told Sanchez she would call Joseph Martin to see if he had any shells. Later that evening, according to Cunningham, Joseph Martin arrived at the Sanchez house, discussed shotgun shells with them, and then left. A short time later, when Martin had returned, Sanchez went out alone to talk with him. Sanchez returned to the house with a shotgun shell which he showed to Cunningham. Sanchez then loaded a shotgun with the shell previously obtained from Schomer and, also, with the one he had gotten from Martin.

Cunningham also testified that later that same evening he and Sanchez had waited outside Cotton's residence for several hours, anticipating Cotton's return from work. Shortly after 3 a.m. Cotton returned and, as he went to the back door of his home, Sanchez pointed the gun at Cotton and, as Cunningham started to run, Cunningham heard two shotgun blasts.

Two other witnesses testified that Sanchez, subsequent to the murder, had shown them a 12-gauge, bolt-action shotgun. One witness, John Carroll, testified that Sanchez had approached him to see if he wished to purchase the gun. The other witness, Ronnie Shelton, corroborated Cunningham's testimony that Sanchez had shown him the shotgun, which Cunningham knew to be the one Sanchez had used to kill Cotton. Shelton also testified that Sanchez indicated that anyone who messed with him (Sanchez) would "get taken out of the game."

Another witness called by the State was Steve Gortva, an inmate at Joliet State Penitentiary, where he was serving a sentence for rape. Gortva testified that in November 1976, Sanchez had told him that he had killed Cotton and that subsequent to that statement, Sanchez had threatened to kill him (Gortva) if he told anyone. Gortva also testified that he was not coerced into testifying because of any threats nor was he receiving any special consideration for his testimony as to the Sanchez conversation with him admitting the shooting.

After the State had rested, the defense called Joseph Martin to testify, and Martin denied ever talking to Bernice Schomer about shotgun shells. He also denied ever supplying Sanchez with any shells and talking with Sanchez on the day before the murder. The State cross-examined Martin and brought out that Martin had dated Mary Sanchez, a sister of defendant Anthony Sanchez and a daughter of Schomer. The State also brought out on cross-examination, over objection by the defendant, that Martin had requested immunity prior to his testimony before the grand jury.

The jury returned verdicts of guilty against Schomer on the solicitation and conspiracy counts and as against the defendant Sanchez on the murder and conspiracy counts. The defendant Schomer was then sentenced to 10 to 30 years in the penitentiary on the solicitation conviction.

Defendant filed a motion in this court, after the filing of the appeal, to add an additional issue raising the question of whether the State's cross-examination of the defendant's witness Martin, concerning the witness'

prior request for immunity, was improper and, also, whether it was of such character as to require reversal. The motion was, on the basis of the representation of the defendant, filed by reason of the opinion of this court in *People v. Godsey* (3d Dist. 1978), 57 Ill. App. 3d 364, 373 N.E.2d 95. We have taken such motion with the case for consideration. The defense in the argument in this court contends that the cross-examination which disclosed that Joseph Martin had requested immunity prior to his grand jury testimony in the case was such as to require or justify reversal.

■■ As we have previously noted, Martin was called by the defense at the trial and in his testimony denied talking with Schomer about shotgun shells and denied supplying Sanchez with any shells. On cross-examination, in addition to establishing that Martin had been dating the daughter of Schomer and the sister of Sanchez, the State was allowed to bring out that Martin requested immunity prior to testifying before the grand jury. The defense argues that Martin's request for immunity had no impeachment value and that its admission into evidence prejudiced defendant Schomer by discrediting her most important witness. In support of the defense, the appellant relies on *People v. Godsey* to which we have referred. In *Godsey*, the defendant's wife and brother testified on his behalf and the State was allowed to bring out, for impeachment purposes, that they had both utilized the fifth amendment in the grand jury proceedings concerning the criminal matter then before the trial court. We found there that the prosecution's use of the prior invocation of the fifth amendment before the grand jury was error, but we also found in that case that the error was harmless in view of the record in the case. In our opinion in *Godsey* we relied heavily on the reasoning of two Federal appeals courts' decisions (*United States v. Rubin* (5th Cir. 1977), 559 F.2d 975; *United States v. Tomaiolo* (2d Cir. 1957), 249 F.2d 683). We there expressed our concern that the use of a witness' prior silence to impeach him undermines the protections guaranteed by the fifth amendment and tends to encourage the evils that the amendment was intended to remove. (*People v. Godsey* (3d Dist. 1978), 57 Ill. App. 3d 364, 372, 373 N.E.2d 95.) In the *Godsey* case, referring to *Rubin* and *Tomaiolo*, we also noted, depending on the circumstances of a particular case, a witness' use of the fifth amendment before a grand jury may not be at all inconsistent with later exculpatory testimony given at that trial. (See also *Grunewald v. United States* (1957), 353 U.S. 391, 1 L. Ed. 2d 931, 77 S. Ct. 963.) The distinguishing feature in those cases from the instant case is that, in the other cases, the prosecution used a defense witness' prior silence before the grand jury, under claim of the fifth amendment, to impeach said witness at a subsequent trial. In the instant case, it was not silence before the grand jury, nor the use of the fifth amendment which was brought out to impeach Joseph Martin's exculpatory trial testimony. The impeachment evidence allowed in by the court was Martin's own

request for immunity, made to the prosecutor at the outset of the grand jury testimony, before any possibly incriminating question had been asked. Such request as Martin made is not equivalent to silence resulting from use of a constitutional privilege against self-incrimination. By his request for immunity in exchange for testimony before the grand jury, Martin indicated that his testimony would likely be incriminating to him, Martin, as well as possibly helpful to the prosecution in the case against Sanchez and Schomer. This attempt to strike an immunity bargain with the State was inconsistent with the totally exculpatory statements as to himself and defendants Sanchez and Schomer made subsequent to the grant of immunity in his testimony before the grand jury and at the trial. The trial. court in the instant case went so far as to conclude that by requesting and receiving immunity and then offering only exculpatory statements, Martin had perpetrated a fraud upon the grand jury, the prosecutor and the court. The trial court felt that this fraud was a circumstance for the jury to consider in weighing Martin's credibility. Whether or not such conduct on the part of the witness constituted a fraud upon the judicial system, we find Martin's request for immunity to be sufficiently inconsistent with his later exculpatory testimony at trial so as to justify its use for impeachment purposes. There was no fifth amendment claim by Martin in procedures before the grand jury or in the trial in the instant case.

Evidentiary matters of the character under consideration are normally within the discretion of the trial court and the trial court's decision thereon will not be reversed unless there is an abuse of discretion shown and that it results in prejudice to the defendant. *People v. Gardner* (5th Dist. 1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.

We conclude that the cross-examination for impeachment purposes was proper and find no abuse of discretion in the court's allowance of cross-examination to disclose the previous statement in which Martin requested immunity prior to testifying before the grand jury.

The attempt of the defendant to avoid this result, by elevating Martin's immunity request to an assertion of his fifth amendment privilege is not justified by the circumstances and facts in this case. Martin made the request before any possibly incriminating questions had been asked of him and he made it at the outset of his grand jury appearance. We find that there is no basis for the assertion that by initiating the immunity bargain, Martin was thereby asserting his fifth amendment privilege to remain silent. The defense reliance upon *Kastigar v. United States* (1972), 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653, and *Stevens v. Marks* (1966), 383 U.S. 234, 15 L. Ed. 2d 724, 86 S. Ct. 788, is misplaced. Those cases addressed the breadth of immunity which must be given before the State can compel testimony which would otherwise be protected under the

fifth amendment. The court held that immunity as broad in scope as the privilege against self-incrimination must be given before the privilege is no longer available to a witness. Neither case supports the proposition that the defense would have us adopt, to the effect that when a witness requests immunity from prosecution in exchange for his testimony, he is also asserting his fifth amendment right to remain silent. While the bargaining position of a witness vis-a-vis immunity results both from the nature of his testimony and his ability to otherwise withhold it, through the invocation of the fifth amendment, it does not follow that thereby a request for immunity acts automatically as an assertion of the privilege. The instant case does not present such circumstances. We note, also, that in *Godsey*, prejudice to the defendant was due to his own lack of silence. Clearly, the same could be said for the instant case. The jury in the instant case was able to make its decision based upon the testimony of numerous witnesses and the accuracy of their testimony. In *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, the court held that errors will be regarded as harmless if the court believes beyond a reasonable doubt that they did not contribute to the verdict of the jury. It is obvious in any error which may have occurred with respect to the impeachment of Martin would be harmless, given the evidence from corroborating witnesses Carroll and Shelton concerning the gun and the testimony of Cunningham and, also, the testimony of witness Gortva that Sanchez had admitted to him that he had killed Cotton (as to the defendant Sanchez).

The other issue raised by defense focuses upon the sentence imposed by the trial judge. The trial court, prior to sentencing defendant Schomer to a term of from 10 to 30 years, had before the court a presentence report and had heard arguments from both sides at the sentencing hearing. Substantially, the defense argument concerning the sentences is that the trial court was *possibly* acting under an erroneous assumption that the minimum sentence for solicitation to commit murder was 4 years, when, in fact, any minimum to be imposed lies within the sound discretion of the trial court. (See *People v. Athey* (4th Dist. 1976), 43 Ill. App. 3d 261, 356 N.E.2d 1332; *People v. Moore* (1978), 69 Ill. 2d 520, 372 N.E.2d 666; Ill. Rev. Stat. 1975, ch. 38, pars. 8—1, 8—4.) In *Athey*, the Fourth District Appellate Court vacated a 4- to 8-year sentence imposed by the trial court for attempted murder, where the trial judge, at sentencing, expressed his belief that the offense carried a mandatory minimum of 4 years.

⊛ 2 We do not find it necessary to go any more extensively into the substance of the argument presented by the defense on this issue, for, unlike the situation in *Athey* and *Moore*, the record in this case is completely devoid of any indication that the trial judge misconceived the scope of his discretion in sentencing the defendant. The proposition is well settled that the burden on appeal is on appellant to demonstrate error

in the record, and failing to do so, there is a presumption of regularity which attaches to the proceeding in the trial court. Even assuming, *arguendo*, the trial judge mistakenly believed the minimum allowable sentence was 4 years, the actual sentence imposed, 10 to 30 years, evidences no indication that the judge was thinking in terms of minimum allowable sentences when he sentenced Bernice Schomer. On the contrary, the trial judge, by his specific sentence, indicated his view of the seriousness of the defendant's crime and her potential as a danger to society. The sentence imposed was within the trial court's discretion, both as to minimum and maximum, and we find no reason to remand the case for resentencing.

For the reasons stated, therefore, the judgment and sentence of the Circuit Court of Rock Island County in this cause is affirmed.

Judgment and sentence affirmed.

BARRY, P. J., and SCOTT, J., concur.