THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BERNETT THOMPSON KIEL, Defendant-Appellant.

Third District    No. 78-217

Opinion filed September 7, 1979.

Dennis A. DePorter, of Braud, Warner, Neppl & Westensee, Ltd., of Rock Island, for appellant.

Edward Keefe, State's Attorney, of Rock Island (Gary F. Gnidovec and Joseph A. Mueller, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

After a bench trial in the circuit court of Rock Island County, the defendant, Bernett Kiel, was found guilty of conspiracy to commit murder and sentenced to a term of imprisonment of from five to 15 years.

On appeal the defendant presents two issues: (1) the trial court erred in admitting the hearsay statements of alleged co-conspirators where the State had failed to establish first by independent evidence a prima facie case of conspiracy and (2) the State did not prove the defendant guilty beyond a reasonable doubt. We reverse.

The charge against defendant and others arose out of the shotgun murder of William Cotton in the early morning hours of December 11, 1974. Late in 1976 defendant was initially charged with murder and conspiracy to commit murder. The charge of murder was later dismissed and the defendant was convicted of conspiracy. At the time defendant

was charged, Anthony Sanchez, Bernice Schomer and Dwayne Cunningham were all charged with various offenses stemming from the murder. In exchange for his testimony, Cunningham was granted immunity from prosecution and testified at the trials of the various other defendants. Defendant's trial was severed from the trial of Sanchez and Schomer, who were tried jointly first. Schomer was convicted of solicitation to commit murder and Sanchez was convicted of murder. Those convictions were affirmed on appeal. *People v. Schomer* (1978), 64 Ill. App. 3d 440, 381 N.E.2d 62; *People v. Sanchez* (1978), 64 Ill. App. 3d 446, 381 N.E.2d 66.

At her trial on June 13, 1977, the sole evidence of defendant's guilt of conspiracy was provided by Cunningham. Cunningham testified that on December 9, 1974, he arrived at the residence of the defendant and Sanchez (Schomer's son). Schomer, who lived next door, defendant, Sanchez, and Mary Sanchez, Schomer's daughter, were all present. When Cunningham entered the residence Schomer had a .38-caliber derringer in her hand. It appears that immediately prior to Cunningham's arrival, the victim, William Cotton, had been there inquiring about some money the defendant owed to Cotton. Kiel was either unable or refused to pay Cotton, whereupon Cotton threatened to take the television set. Schomer prevented him from doing so with the derringer, saying that if anything was taken he would be dead. According to the witness, Schomer then repeatedly said she wanted the "nigger" dead. Schomer sent the witness upstairs to get something and, while on the landing, he overheard a conversation. He said the topic of the conversation was Cotton and the defendant owing him some money. The witness then testified:

> "Well, Anthony Ray Sanchez didn't want his mom to get into it and she said she wanted him dead, that if he wouldn't do it she would, and he kept telling her not to get involved, and Miss Kiel said she would get her brother Charles to take care of it.
> Q. During the course of this conversation were they discussing any other person besides William Cotton?
> A. No."

Cunningham returned downstairs and the conversation continued:

> "Well, after I come downstairs from the landing I didn't have what Mrs. Schomer sent me upstairs to get, so she sent her daughter upstairs to get it, and they got, Anthony kept telling his mom he didn't want her to get involved, and Mary Sanchez went upstairs and I came downstairs that is when she stated she would get her brother, Charles to kill the man and then nobody had to do the killing, and we left, me and Anthony Sanchez."

Following this conversation Sanchez, who had a .38-caliber revolver, and Cunningham drove to the victim's house, but he was not home. Later that

evening, the two returned to the Sanchez-Kiel residence with the defendant, Sanchez, and Cunningham present, and the conversation again turned to Cotton.

"A. * * * he was telling me that he was going to take care of Cotton and she kept saying she wanted to go along.

Q. By 'she' who do you mean?

A. Bernett Thompson Kiel.

Q. And go with who?

A. Anthony Ray Sanchez.

Q. When?

A. When they go to shoot Cotton.

Q. What if anything else happened?

A. And he got upset with me. He kept telling me we had business to take care of and she said she wanted to go and he called her a child and, excuse me, ass and weak mind and why let a woman do what I'm suppose to do, and he told her she wasn't going to go and that I was going to go, and then he told her to get his bolt."

The bolt referred to was a bolt-action shotgun. The defendant then went downstairs and brought up a shotgun, but it was the wrong shotgun. Sanchez then obtained the correct one. During this time period, the witness testified to smoking a number of marijuana cigarettes.

The next afternoon, December 10, Cunningham again went to the Sanchez-Kiel residence. He admitted to taking mescaline and marijuana. Cunningham and Sanchez obtained a 12-gauge deer-slug shotgun shell from Joe Martin. Cunningham then testified to a conversation that took place between defendant, Sanchez and the witness. Sanchez said "he was taking care of business that night and that Cotton was getting on his nerves and whatnot."

"Q. What, if anything, did the Defendant Kiel say?

A. Nothing other than she wanted to go with him when he takes care of it * * *."

Later that evening, defendant Sanchez and Cunningham were at Woody's Clover Club where Cotton was working as a bartender. When the defendant came into the bar, Cotton inquired of defendant about his money. An argument started and Cotton called the defendant a bitch. Defendant then went to a booth where Sanchez was seated. After talking to Sanchez, defendant went to another part of the bar. Sanchez then got up from the booth and pulled a pistol from his holster and started walking to the bar. When Cunningham interceded and stopped him Sanchez said he would kill Cotton.

Cunningham was with Sanchez later that evening and at 4 a.m. on December 11, Sanchez shot and killed Cotton with a shotgun.

On cross-examination, the witness admitted to saying nothing about

the murder until after he was arrested for armed robbery and burglary on about October 1, 1976. He was never prosecuted for those crimes, nor was the witness prosecuted for a battery which occurred while he was in custody. Cunningham admitted that on December 9 he was high on mescaline and had ingested so much that on December 9 and 10 it was "burning out" his brain and that on those days he didn't know what he was doing. The defendant also cross-examined the witness on various prior inconsistent statements the witness had made concerning the defendant's activities on December 9 and 10.

During Cunningham's testimony, defense counsel repeatedly objected to testimony concerning incriminating statements or actions made out of defendant's presence by other co-conspirators, claiming that the State had to first prove a prima facie case of conspiracy by independent evidence and that since the State had failed to do so, the acts and declarations of the co-conspirators were not admissible as an exception to the rule against hearsay. Once Cunningham testified to the defendant retrieving a shotgun for Sanchez, the court overruled all such objections.

The thrust of defendant's first objection concerns two aspects of the State's burden of proving a prima facie case of conspiracy by independent evidence before hearsay of a co-conspirator may be admitted. Defendant claims that the evidence sufficient to establish a prima facie case of conspiracy must all be introduced before the hearsay acts or statements of the co-conspirator may be admitted. Defendant also contends that, considering all the evidence, whenever introduced, the State failed to prove a prima facie case of conspiracy by independent evidence so as to allow the introduction into evidence of the hearsay testimony of Cunningham. We believe the defendant is incorrect in both respects.

As to the temporal considerations of proving a prima facie case of conspiracy prior to admitting the hearsay statements of a co-conspirator, few courts of the State have had the opportunity to consider such an issue. But of those that have, it is generally held that it is within the discretion of the trial court to receive into evidence hearsay statements or acts of a co-conspirator before sufficient proof of the conspiracy by independent evidence had been given. In *People v. Baer* (1976), 35 Ill. App. 3d 391, 398-99, 342 N.E.2d 177, 183, the court stated, "Although the conversation may have been admitted into evidence before sufficient proof of the conspiracy had been given, it was within the discretion of the court to so receive it." Similar positions have been adopted by the courts in *People v. Andrews* (1927), 327 Ill. 162, 158 N.E. 462; *Spies v. People* (1887), 122 Ill. 1, 238-39, 12 N.E. 865, 980; *People v. Trigg* (1968), 97 Ill. App. 2d 261, 240 N.E.2d 130. No suggestion is made that the trial court's

rulings were an abuse of discretion, nor do we believe such a position could stand scrutiny. Hence, we find no error in this regard.

■▌ Considering the evidence of plaintiff's conduct, we believe independent evidence did establish a prima facie case of conspiracy and the court did not err in admitting the hearsay testimony of Cunningham. The various propositions of law pertaining to conspiracies are well stated in *People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897, and need not be repeated here. We do note that the agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the accused concerning the occurrence. Much of the defendant's conduct and statements supporting her involvement in the conspiracy have been previously set forth. Defendant's declarations at various times on December 9 and 10, her conduct in obtaining the shotgun for Sanchez, and her activity at Woody's Clover Club, were all independent evidence of the conspiracy to murder Cotton. We believe such to be sufficient proof of a prima facie case of conspiracy and the trial court did not err in admitting the hearsay testimony of Cunningham.

Having decided there was some independent evidence of the conspiracy sufficient to support the admission of hearsay evidence, the question remains whether the evidence was sufficient to support the conclusion the defendant was guilty of the offense charged beyond a reasonable doubt.

From the earlier description of the facts it can be seen the only evidence tending to prove the guilt of the defendant was the testimony of Cunningham. It is only his testimony that deals with either the independent evidence of the conspiracy or for that matter the hearsay statements of other co-conspirators which relate to the issue of guilt.

Ordinarily the credibility of a witness' testimony is a matter to be determined by the trier of fact. Although the testimony of an accomplice or co-conspirator is competent and sufficient standing alone to support a conviction, it should be viewed with caution and suspicion. *People v. Clements* (1963), 28 Ill. 2d 534, 192 N.E.2d 923.

■ In the instant case Cunningham is not only an accomplice or co-conspirator threatened with the charge of murder if he did not testify against the defendant, but also a witness against whom later occurring offenses were dropped, a witness who failed to make known his story for nearly two years after the incident, and then only after being arrested for robbery and burglary, a witness who, under oath at the time of the preliminary hearing, testified he had no remembrance of the event, a witness whose testimony is inconsistent with other statements and finally, but not the least important, a witness who admitted to the use of dope and mescaline at the time of the occurrence to the point that he was "burned

1036

out." We do not believe these circumstances can be ignored as merely affecting the credibility of the witness, but, render his testimony inherently unworthy of belief. Whereas in this case the impeachment is so patent and substantial we believe that a conviction based thereon is palpably erroneous and hence can not stand.

For the foregoing reasons the judgment of the circuit court of Rock Island County is reversed.

Reversed.

ALLOY and SCOTT, JJ., concur.