(No. 15563.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRED JONES, Plaintiff in Error.

*Opinion filed October 28, 1924.*

1. CRIMINAL LAW—*when an instruction as to circumstantial evidence is proper although self-defense is set up.* Although a defendant charged with murder admits that he shot the deceased and interposes self-defense, it is proper to give an instruction concerning circumstantial evidence where there was no eye-witness to the shooting, and the prosecution may argue to the jury that the circumstances in evidence do not corroborate the story of the defendant.

2. SAME—*instructions as to self-defense and justifiable homicide should not be combined.* Sections 148 and 149 of the Criminal Code, defining, respectively, justifiable homicide and self-defense, should not be combined in one instruction, as they are seldom, if ever, applicable to the same case or the same state of facts.

3. SAME—*instructions must be applicable to the case.* Instructions should not only state the law correctly but they must be applicable to the case, and it may be prejudicial error to give an instruction that is not applicable even though it states a correct principle of law.

4. SAME—*what instruction as to self-defense is not correct.* An instruction as to self-defense which states that if the defendant "believed he was in danger of receiving great bodily injury or that his life was in jeopardy" the killing was justified is not correct, as the law is that the defendant must not only believe but he must also have reason for such belief.

5. SAME—*when a defendant should not be convicted of murder.* Where, under the evidence, there exists reasonable doubt as to whether a defendant charged with murder is guilty of manslaughter or murder, or not guilty, such doubt must be resolved in his favor and he cannot be convicted of murder.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. PHILIP L. SULLIVAN, Judge, presiding.

W. G. ANDERSON, (E. M. SEYMOUR, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

The plaintiff in error, Fred Jones, (hereinafter called defendant,) was convicted in the criminal court of Cook county of the murder of Jesse Patton and sentenced to imprisonment for life in the penitentiary at Joliet, after motions for new trial and in arrest of judgment were overruled by the court. This writ of error is prosecuted to review the judgment.

The defendant is thirty-five years of age, weighs 135 pounds, is about five feet tall and has resided in Chicago all his life. He resided with his mother at 2566 Park avenue, the house facing south. There is a small passageway that runs north and to the back of the premises to the foot of the stairs leading up to the second story, and which is on the east side of the house. Jesse M. Patton, the deceased, was twenty-eight years of age, about five feet nine inches tall, of ordinary build, weighing about 170 pounds. He and his wife had been rooming at the defendant's house about two months prior to November 18, 1922, the day of the homicide. Besides these three, John Davis and his wife and Mack Wiley were all in the parlor on the second floor of the building during the altercations between the defendant and the deceased which resulted in the killing, and the defendant's mother came into the parlor about the time of the first encounter between the

defendant and the deceased.   On that evening the deceased had brought with him some records and he asked the defendant to play them on the victrola, and the defendant complied with his request.   While the records were being played Wiley and the deceased started a game of craps with dice, in which the deceased won about seventy-five cents.   The defendant and the deceased then continued at the same game, and they were soon in a dispute as to which one won in a certain casting of the dice.   A fight or physical struggle arose between them in which they both fell to the floor, with the defendant on top of the deceased, with his head in the deceased's stomach.   There is a conflict in the testimony of the eye-witnesses as to just what took place during this fight.   The defendant testified concerning it as follows:

When the dispute arose between them he told Patton if he wanted to be a nickle-snatcher to go ahead and keep the money, and that he didn't care anything about him any way. He told Patton he was a damned liar, before they clinched. They were at that time very close together.   Patton grabbed him by the collar and they began to scuffle with one another.   They went to the floor.   Patton had witness' head in his stomach, then released his hold, got his knife out of his pocket and cut the witness on the hand and cut his pants at the waist line in trying to stab him in the stomach.   Witness got hold of Patton's hand and called Wiley three times, telling him that Patton had a knife.   Wiley pulled them apart, and witness said to him, "Look here where the dirty sucker cut me."   Witness' hand was covered with blood.   Patton stood in the door, and witness said to him, "What, do you think that you can cut me?" and Patton replied, "That ain't all I am going to do."   Patton then went into his bed-room in the front part of the building and shut the door.   Witness did not see him after that until he went into the back yard.   He looked for his gun in the sewing machine drawer, and explained his conduct by saying that

313–22

Patton had the gun once or twice before that and he was afraid he then had it. He found his gun, went into the kitchen, washed his hand and showed it to Mrs. Patton, and she turned her back on him. He then opened the back door to go down the stairs into the yard, intending to telephone to the police. As he pushed back the screen door and stepped out Patton grabbed at him and said, "I have got you!" Witness "plunged" to get away from him and fell down the steps on his hands and knees, with Patton on top of him, stabbing him in the back. Patton got up off him and tried to get his knife up. Witness grabbed his hand and they clinched on the steps. Patton got hold of his hand and was getting witness' hand loose from his, and when he got it loose he was on witness' back on the steps and said, "God damn you, I am going to kill you." Patton had him on the second landing, with his knife out and cutting him in the back. Witness did not see the knife but felt it, and identified the knife, which was in court. Patton turned him loose and then grabbed him again, and when he was getting away from him witness pulled the gun out and shot Patton after Patton had stabbed him four times. When he shot him both of them fell together. They were on the steps, and he thought Patton had his hand up when he shot him and that both of them were standing. He did not know whether or not the gun was right against Patton's body when he fired or what part of his body he shot. He said, "I had no idea, exactly, of shooting Patton when I took that gun." He did not know that Patton had gone through the bed-room and out the front window and did not see the other people go into Patton's bed-room. When Patton first grabbed him as he went out the back door, witness fell down the steps to the third landing. He exhibited his back and shoulders to the jury where he was cut, and stated that he got those cuts on the back steps and not in the house. He did not know what became of the gun with which he shot Patton, and that he "next remembered of it"

after shooting Patton, when they fell from the second or third step to the ground. He got the revolver before that night from a brown-skinned fellow they call Joe, whom he had known about a year prior, and that Joe gave it to him to keep for him. He gave no explanation of how the fellow happened to give it to him to keep for him. He could not tell what kind of gun it was, and stated that it was loaded when Joe gave it to him. He did not know that he was pretty angry at Patton before he shot him and did not remember Patton sitting upon the davenport in the parlor after their first grappling with each other. He did not drag Patton down the back steps after shooting him and leave him in the yard. When he started out the back way with his gun he was bareheaded. Wiley came out of the house after the shooting and threw his hat down to him while he was standing over the body of Patton, about six feet from the bottom of the steps, in the yard. He did not know when he started out the back way that Patton had jumped out of the window and was at the back screen door. He surrendered to the police that night after the shooting, which occurred before or about nine o'clock P. M., and his clothing and his body were examined at the police station, and he was sent to the Bridewell for examination after being so examined.

According to the testimony of all the eye-witnesses, just after the struggle between Patton and the defendant in the house, Patton went into his bed-room and out of the front window to the ground below, and to do this he had to drop about twelve or fifteen feet. Why he went to the rear of the premises through the passageway can only be surmised from what followed. No one in the house knew why he went there or that he had gone there, until the second fight was on. Mrs. Patton and Wiley went into his room about three minutes after he had closed the door and for the first time found that he had left the room through the window. There is no positive evidence in the record that the defend-

ant knew that Patton was in the back part of the premises when he started out the back door with his gun. Some of the witnesses stated that he was very angry at that time, and the wife of the deceased stated that when Patton went into the front bed-room and shut the door the defendant said, "Where is my gun?" and then said to her, "That is your husband, but I am going to kill the dirty son of a bitch." Wiley, who appeared to be very friendly to the deceased, testified that Jones was very angry, and that just after the struggle in the parlor he said, "Where is my gun?" Davis and Wiley in the main corroborate the defendant as to the occurrences before and during the difficulty in the parlor. They both testified that no blows were struck by the parties in the house. Davis and Mrs. Patton testified that the defendant invited Patton to go into the alley and fight it out with him. Mrs. Patton testified that her husband told her just before he went into the parlor, to gather up her things and they would go to another boarding house. Mrs. Jones testified that after the parties got up off the parlor floor Patton was excited and invited her son into the alley. The testimony of the physicians shows that the deceased was shot about four or five inches below the left shoulder and just below the arm pit; that the bullet entered his body between the fifth and sixth ribs and passed through the lung back of the heart, ranging down slightly to a point between the seventh and eighth ribs. The defendant's clothing was admitted in evidence and appeared to be very bloody at that time, particularly the outside portion of the coat he wore that night. There was no testimony at any time by the defendant that this clothing was in the same condition on the day of the trial as it was on the night of the killing. There were a number of witnesses who testified as to the good reputation of the defendant for peaceableness in the neighborhood in which he lived. The People introduced the record of a former conviction of the defendant for murder, for which he was sentenced on December 23, 1911, was

paroled May 11, 1920, and finally discharged from prison July 17, 1922.

It is the theory of the prosecution that the defendant shot the deceased on the steps and dragged him down and into the yard, and that there was no struggle between them after Patton was shot and that he died almost instantly. The testimony of the police is to the effect that there was much more blood on the outside of the defendant's clothing when it was produced in court than there was on the night of the killing, when he visited the police station. Their testimony further showed that they examined his under-clothing and his coat after the killing that night, and that there was blood on the inside of the coat, on that part that covered his shoulder when it was on him, and that just underneath that part of his coat they found two wounds, which they indicated were not very severe, but stated that one of the wounds had bled enough to wet a place on his undershirt about two and a half by three inches, but that it was not bleeding after he got to the police station. It was further shown by the testimony of the police that they found the deceased's knife on about the third step of the back stairway and that both the handle and the blade were bloody; that the blade was about two inches long and the handle about three inches long. The police further testified that they found a pair of eye-glasses at the north end of the passageway and close to the stairway, which were identified as the glasses of the deceased. They also found blood on two steps of the stairway leading to the first floor and some blood spots on the floor of the first landing. The doctor at the Bridewell examined the wounds on the back and shoulder of the defendant and described them as having the appearance of being made with a hat-pin or an ice-pick. He stated that they were not bleeding at that time and he did not regard them as very serious wounds. One of the policemen described one of the wounds as being about a quarter of an inch long. The testimony showed that there were

no powder burns on any part of the clothing worn by the deceased.

The defense interposed in the case was self-defense. It is contended that certain instructions offered by the People were erroneous and not applicable to the case. It is also very strenuously insisted that the court erred in giving an instruction on circumstantial evidence, because the killing was admitted and the only defense was self-defense. There were no eye-witnesses to the killing, but there were certain physical facts testified to which the State claims were sufficient to show that the defendant's testimony as to what happened just preceding the killing is untrue. Some of these facts are, as claimed by the State, that the bullet entered the deceased's back and ranged downward; that there were no powder marks on his clothing; that the deceased was nine inches taller and considerably larger than the defendant; and that the deceased's eye-glasses were found near the place where he fell. It was therefore the theory of the State that the deceased was on the ground when he was shot and moving away from the defendant. There is the further fact alluded to by the State that the deceased fell upon his back, with his arms extended out from his body, as competent evidence to prove that the deceased was shot in the yard and not on the stairway. We do not concur in the State's contention as to the evidence showing that the deceased was shot in the back, as the evidence in the record shows that he was shot at the point of the body indicated by our statement in this case. It was the right of the State, however, to have an instruction on circumstantial evidence and to argue to the jury that the circumstances did not corroborate the testimony of the defendant.

The court did err in the giving of instructions to the jury. Quite a number of instructions were given upon the subject of murder and some on the subject of malice. Sixteen instructions in all were given by the People, and all of them ignored the defense interposed and made no ref-

crence to it except the fourteenth instruction, which was not applicable to the case at all and did not undertake to set out the law of self-defense. That instruction, in the language of the statute, informed the jury "that if a person kill another in self-defense, it must appear that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also, that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given." The language of the above instruction is literally taken from our Criminal Code and is section 149 thereof. To this instruction, and as part of it, is also appended section 148 of the Criminal Code,—a section defining justifiable homicide,—which is in this language:

"Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property, or against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge."

It will be observed that a large part of this instruction is not at all applicable to this case. There was no pretense that it was a case of a killing in the defense of habitation or property or to prevent the commission of any felony

described in said section. The deceased was a lodger in the house of the defendant and was lawfully in the house when the first fight occurred. He was not intending to enter the house, or attempting to do so, to commit any offense or felony named in said section of the statute, or to enter the defendant's house for the purpose of assaulting or offering personal violence to anyone dwelling or being therein. The sole question in the case is whether or not the defendant killed the deceased in self-defense after the deceased and the defendant had ceased the first conflict. We have several times said in certain cases, that where sections 148 and 149 of the Criminal Code are given to the jury in the language of the statute, the instructions are substantially correct and not reversible error. As a matter of fact, the giving of these two sections in an instruction to the jury is a mere labor-saving device, which should not be resorted to in any case. Perhaps no case has come before this court, or will come before it, in which both these sections were or could be considered a proper instruction and applicable to the case. Instruction 14 was not at all applicable to the case now in hand and giving it must be considered error prejudicial to the defendant. An instruction cannot at all times be regarded as harmless because it states correct principles of law. Instructions should not only state the law correctly, but they should be applicable to the case and give the jury to understand what the law is that is applicable to the case. This court reversed the judgment in *People* v. *Black,* 309 Ill. 354, for very much the same reasons that we have above given.

The court gave a number of instructions for the defendant on the law of self-defense, very few of which, if any, correctly stated the law of self-defense, but the error in those instructions was in favor of the defendant. One of these instructions was No. 12, which stated the law of self-defense in this wise: that if the jury believed from the evidence in the case "that the defendant was assaulted by

the deceased with a knife, and that he, Fred Jones, believed he was in danger of receiving great bodily injury, or that his life was in jeopardy, that under such circumstances the killing of the deceased was justified, and you should find the defendant not guilty." The law is that the defendant must not only believe that he was in danger of receiving great bodily harm or that his life was in jeopardy, but that he must also have reason to believe, from his standpoint, that he was in such danger. We cannot balance error in this record against the defendant and error in his favor under the evidence before us and say that he was not really prejudiced. There is really one outstanding fact in the record in favor of the defendant that has not been explained or shown by the evidence to indicate that the deceased was running away from or avoiding the defendant, and that is, that the deceased was on the back stairway at the time the defendant went on it, that he had jumped from the second story of the building to the ground and had gone to this back passageway. Such fact does not comport with the theory that the deceased was trying to get away from the defendant and was waiting for his wife to go to another boarding house, but very strongly tends to show that he was there for the purpose of meeting and having further encounter with the defendant, should he come out that way. The defendant's testimony rather clearly shows that he was not a fair witness, and the jury were warranted in believing that he was not a truthful witness because of the fact that he was contradicted by other witnesses, and because of the further fact that some of his story was unreasonable, particularly about the gun. The police stated that the defendant denied to them that the fight started over a crap game. According to their testimony the outside of the defendant's coat had much more blood on it at the trial than it had just after the killing. It may have been for these reasons that the jury did not take any extraordinary pains to see that he got all the benefit the law of the case guaran-

teed to him and got the benefit of every reasonable doubt as to his guilt. At any rate, this court entertains a reasonable doubt of the defendant being actually guilty of murder, and where there exists a reasonable doubt as to whether he is guilty of manslaughter or murder, or not guilty, such doubt should be resolved in his favor. We have very much doubt upon those questions, and because the evidence very strongly tends to show to our minds that neither of these parties was running away from the fight.

The judgment of the criminal court is reversed and the cause is remanded.          *Reversed and remanded.*