THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE E. McKINNIE, Plaintiff in Error.

*Opinion filed February 24, 1928.*

1. CRIMINAL LAW—*what sufficient to establish intent in prosecution for assault with intent to rape.* In a prosecution for assault with intent to rape the specific intent is the gist of the offense, and such an assault must be shown that if the purpose had been accomplished the crime would be rape, but an express intent need not be proved, and where the assault is shown, the intent may be inferred from the acts as well as the words of the defendant during the assault; and the fact that he afterwards abandoned his purpose does not relieve him from criminal liability.

2. SAME—*instruction may be refused if another has been given on same subject.* To refuse an instruction which, in effect, merely repeats another already given affords no ground for complaint.

3. SAME—*when, only, will conviction be reversed on evidence.* The Supreme Court will not disturb a verdict or reverse a judgment of conviction on the ground that the evidence is insufficient to convict unless the verdict is palpably contrary to the weight of the evidence, or the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

JOHN G. FRIEDMEYER, and SCOTT & SCOTT, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, H. E. FULLENWIDER, State's Attorney, and MERRILL F. WEHMHOFF, (J. M. WELDON, and L. E. SULLIVAN, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

George E. McKinnie was indicted in the circuit court of Sangamon county for assault with intent to rape Emma Requarth. A jury trial resulted in a conviction and sen-

tence to the Southern Illinois penitentiary at Chester. McKinnie prosecutes this writ of error for a review of the record.

The prosecution's evidence shows that on November 12, 1926, Emma Requarth, a married woman upwards of forty-five years of age and a resident of the city of Springfield, went to Oak Ridge cemetery to decorate her son's grave; that she arrived at the east gate of the cemetery about noon, walked to the new or western part of the grounds, where her son was buried, changed the flowers on his grave, and after stopping there a few minutes crossed a road to a hill in close proximity, intending to go to her father's grave, which is located near the entrance to the cemetery; that when she passed over the hill, about 12:30 or 12:45 P. M., and was about a third of the way down on the opposite side, she heard a voice calling from behind, "Lady, I have lost a grave and cannot find it;" that Mrs. Requarth, turning to the inquirer, who was a man, asked, "What is the name? I know quite a few people who are buried here and it is possible I could help;" that the man replied, "The name is Clark," and Mrs. Requarth answered, "No, sir; I don't know anybody by that name;" that he then grabbed her, threw her to the ground, face downward, and was immediately astride her body; that she screamed, and he put his hand on her mouth and said, "Shut up! Shut up!" and struck her on the head; that she screamed a second time and he struck her again; that when she screamed the third time he took from his pocket a tool which looked like a file and struck her on the head with it, causing her to bleed; that he did not disturb her clothing, and when he discovered that she was injured he said, "Oh, lady! Come and get up! I didn't mean to hurt you!" that he then assisted her and picked up her hat, glasses, pocket-book and a package of grass seed which had fallen to the ground and gave them to her; that she asked, "Why don't you take my pocket-book and let me alone?" and without answering the

question he said, "Please come and get in my car and I will take you anywhere you want to go;" that he then dragged her to the front of his automobile, and as he did so the blood from her head trickled down on his coat or sweater, which was of a tannish-brown color; that as he went to open the west door of his automobile she discovered that the car bore Illinois license number 900-822 for the year 1926; that he again requested her to enter his car and inquired where she wanted to go, and she answered she was on her way to her father's grave; that he then repeated that he would take her anywhere she wished to go, but that she replied, "No, sir; please let me alone; you go your way and I will go mine;" that she again asked why he did not take her pocket-book and leave her; that he then jumped into his car and drove away at high speed, and that as the car, which was a Chevrolet coupe, was leaving, she again saw its license number. Mrs. Requarth further testified that after the car left she started down the hill, screaming for help, and soon attracted the attention of R. J. Biernbaum, the superintendent of the cemetery, and some of the employees under him; that she told Biernbaum what had happened and gave him the license number of the car, which had disappeared; that she was assisted into Biernbaum's automobile, and at her request was taken to the home of Mrs. Smith, a friend, who lived just outside of the cemetery gate; that later she was removed to the Springfield Hospital, where she remained a week, and that the plaintiff in error was brought into her presence at the hospital and she identified him as the man who attacked her. Of the apparel worn by the plaintiff in error at the time of the assault Mrs. Requarth identified only his sweater, for she had taken no notice of his hat, cap or trousers.

R. J. Biernbaum, the superintendent of the cemetery, corroborated the testimony of Mrs. Requarth with reference to what occurred at and after the time she attracted his attention by her screams. Immediately after he took her to

Mrs. Smith's home he reported the crime to the police. He also gave them the license number of the automobile that had disappeared.

James McInerney, a police officer who was present at the police station when Biernbaum made his report, testified that he and officer George Pehlman ascertained that automobile license number 900-822 had been issued to Edwin E. McKinnie, 331 South Douglas avenue, Springfield; that they, the two officers, proceeded to that street number and asked McKinnie, with whom officer Pehlman was acquainted, to see the automobile; that as they passed to the rear of the house they saw a Chevrolet coupe bearing the particular license number; that upon inquiry McKinnie told them the plaintiff in error was his son and that the latter had taken the car out earlier in the day; that after obtaining information that the plaintiff in error had gone to Williamsville, a village about ten miles northeast of Springfield, the officers went there in search of him, but failing to find him they returned to Springfield and arrived at his father's house at about five o'clock; that as they approached the house a Ford automobile bearing a Michigan license number was driven upon the premises and stopped near the garage and the plaintiff in error alighted from the car; that the officers questioned him concerning his apparel when he drove his father's automobile about noon of that day, and he told them he then wore light trousers and a brownish-colored coat or jacket; that the officers took him first to the police station, and later, dressed in the clothes worn, as he stated, while driving his father's car at noon, to Mrs. Requarth at the hospital; that after officer Pehlman had asked her some questions the plaintiff in error was returned to the police station, and that three days later he was again taken to the hospital, when Mrs. Requarth identified him as her assailant.

George Pehlman, the other police officer, corroborated officer McInerney's testimony concerning the identification

of the automobile license number, their visit to Edwin E.
McKinnie's home and inquiry about the use of the Chevro-
let coupe, their trip to Williamsville and return to the elder
McKinnie's home, their questioning the plaintiff in error
about the clothes he wore earlier in the day, their two trips
to the hospital, and Mrs. Requarth's identification of the
plaintiff in error on the second trip. The sweater or coat
which she said he wore at the time he attacked her was
admitted in evidence.

Five witnesses appeared in behalf of the plaintiff in er-
ror: Lucy McKinnie, his mother; Edwin E. McKinnie,
his father; Harriet J. McKinnie, his grandmother; Lena
Robertson, a servant in the home of his aunt; and the plain-
tiff in error himself. Lucy McKinnie testified that on No-
vember 12, 1926, at about noon, she was at the home of
her sister, who was then very ill; that in response to a
request over the telephone her husband called in his Chev-
rolet coupe and she returned home with him, reaching there
shortly after one o'clock, when she found the plaintiff in
error in the kitchen, and that shortly afterwards her son
left in his Ford car, stating that he was going to Williams-
ville. The witness further testified that in the morning of
the same day she had instructed the plaintiff in error to go
to Oak Ridge cemetery to remove the dead flowers from
her brother's grave, and that she knew he had carried out
her instructions because she found upon investigation that
he had done so.

Edwin E. McKinnie testified that his son left home dur-
ing the forenoon of November 12, 1926, in the Chevrolet
automobile, to get a cap for some part of the oiling mechan-
ism of his, the son's, Ford car; that he returned at 12:30
o'clock, wearing a light hat, tan shoes and the sweater in-
troduced in evidence, with another sweater over it, and that
he remained at home until about 1:20 P. M.; that he, the
witness, knew the time because his wife called him from
her sister's house at 12:35 P. M., requesting him to get her;

that he reached the house of his sister-in-law about two minutes before one o'clock; that after remaining there five minutes he returned with his wife, and upon their arrival at home found the plaintiff in error in the kitchen, and that soon thereafter the latter left in his Ford car. The conversation between the witness and the police officers was admitted.

Harriet J. McKinnie, who lived with her son, Edwin E. McKinnie, testified that she was at home all day November 12, 1926, and that she heard the plaintiff in error, her grandson, return home about 12:30 o'clock; that he was there when her son brought his wife home, about 1:15 P. M., and that shortly thereafter her grandson left, returning about five o'clock.

Lena Robertson testified that Edwin E. McKinnie arrived at the home of his sister-in-law in his automobile on November 12, 1926, at two or three minutes before 1:00 o'clock P. M., and that he soon left with his wife.

The plaintiff in error testified that he was thirty-two years of age; that about 9:30 A. M. on November 12, 1926, he left in his father's Chevrolet coupe and called at one automobile accessory shop and then another to buy a cap for his Ford car; that about 11:45 A. M. he went to Oak Ridge cemetery in obedience to his mother's request to remove the dead flowers from his uncle's grave; that after placing them in a receptacle kept for that purpose he drove to the top of a hill, turned around, left the cemetery through the gate he had entered, and reached his home about 12:30 P. M.; that he remained there twenty or twenty-five minutes, when he departed in his Ford car for Williamsville, where he sought a job that had been advertised in a newspaper, and that he arrived home at five o'clock; that shortly after his return police officers came and inquired whether he was dressed as he was in the morning, and when he answered in the negative they asked him to fetch the clothes he then wore, and that he com-

plied with their request. The plaintiff in error further testified that he had worn the sweater admitted in evidence, with another one, dark-brown in color, over it; that there were no blood-stains on the outer sweater, but that the other one was stained with rabbit's blood on the arm and side, and that these stains were received on the day before Mrs. Requarth claims to have been attacked, when he with his father and another man were hunting. The plaintiff in error not only denied the charge made in the indictment but asserted that he had never been in the new or western part of Oak Ridge cemetery where that charge is laid, and that he had never seen Mrs. Requarth until he was ushered into her presence at the hospital, following his arrest.

After the plaintiff in error had concluded his testimony, Edwin E. McKinnie, his father, again took the witness stand and corroborated his son's testimony with reference to the hunting trip. The father testified that he and his son killed ten rabbits; that while hunting, his son wore the sweater introduced in evidence, which was light-colored, with a hunting coat over it; that his son put two rabbits in the inside pocket of this coat, and their blood leaked through at the bottom of the pocket and the coat was bloody; that on the evening of the 11th of November his son removed his hunting coat, and in cleaning the rabbits while they were suspended from nails on the back of the garage the arm and pocket of his sweater were stained with their blood.

In rebuttal, Walter G. Bain, a physician, testified that he was the director of the laboratories at St. John's Hospital, in Springfield; that he cut a stained portion out of the sweater admitted in evidence and examined it for the presence of blood and to determine whether the blood-stains, if any, were those of a human being or of an animal; that he made a biochemical test for that purpose; that such a test is possible because there are certain precipitants formed in the blood serum which exist for a long time; that the

serum of rabbits' blood does not contain the human pre-
cipitant, and that from his examination of the stained
portion of the garment he found that the stains were of
human blood.

The first contention of the plaintiff in error is, that to
constitute the crime charged the assailant's intent to rape
and to use whatever force was necessary to overcome his
victim's resistance must be established; that these elements
are lacking in the evidence, and that the prosecution must
therefore fail. Emma Requarth, the complaining witness,
testified that the plaintiff in error threw her to the ground
and was astride her body. When she resisted her assailant
resorted to force, for he struck her on the head three times.
One of these blows was inflicted by a tool or instrument
which caused her to bleed. Robbery was not his object,
for he did not take her pocket-book although the oppor-
tunity was twice afforded him. His position and acts show
that he intended to commit rape and to use whatever force
was necessary to overcome her resistance. In prosecutions
of this character the specific intent is the gist of the offense,
and such an assault must be shown by the evidence that if
the purpose had been accomplished the crime would be rape.
An express intent, however, need not be proved. The in-
tent may be inferred from the acts, as well as from the
words, of the person charged with the crime. *People* v.
*Makovicki,* 316 Ill. 407; *People* v. *Cieslak,* 319 id. 221;
*People* v. *Guilfoyle,* 321 id. 93.

Complaint is made of the giving of the fourth instruc-
tion requested by the People and of the refusal to give the
ninth instruction requested by the plaintiff in error. The
People's fourth instruction was as follows:

"The court instructs the jury that one of the defenses
relied upon by the defendant is that of alibi. You are fur-
ther instructed that, although you may believe from the evi-
dence that the movements of the defendant may have been
accounted for at some part or portion of the time before

and at the commission of the crime charged in the indict-
ment, still, before this defense would be sufficient to author-
ize an acquittal of the defendant, it must appear that, at
the time of the commission of the crime charged in the in-
dictment, the defendant was at another place so far away,
under such circumstances, that he could not with ordinary
exertion have reached the place where the crime was com-
mitted so as to have participated therein."

The plaintiff in error fails to point out wherein this in-
struction is erroneous, and his complaint in respect to it
need not, for that reason, be considered.

The ninth refused instruction, which the plaintiff in er-
ror requested, concerned the defense of an alibi. Two in-
structions which correctly stated the law upon the subject
were given to the jury. The refused instruction was sub-
stantially a repetition of one of these instructions. To re-
fuse an instruction which, in effect, merely repeats another
already given affords no ground for complaint. *People* v.
*Andrews,* 327 Ill. 162; *People* v. *Cash,* 326 id. 104; *Peo-
ple* v. *Dear,* 286 id. 142.

It is further contended that the court erred in permit-
ting the sweater to be taken to the jury room. The gar-
ment was offered in evidence and taken to the jury room
without objection. It was worn by the plaintiff in error on
the day the offense was committed and it had blood-stains
upon it. Neither of these facts was in dispute. The jury
could not determine from an inspection of the sweater
whether the stains were of human or animal blood. There
was no other disputed question of fact the solution of
which would be aided by the jury's inspection of the
sweater. Hence it is not apparent how it would be either
helpful to the jury or prejudicial to the plaintiff in error.
Under the facts and circumstances shown in this case, and
particularly in view of the absence of objection in the trial
court, the contention that the taking of the sweater to the
jury room was prejudicially erroneous is without merit.

Finally, the plaintiff in error argues that the jury's verdict was the result of passion and prejudice. It is not disputed that he was in the cemetery at about the hour of the assault and that he had blood-stains on his sweater. Not only was he identified as the assailant, but the blood-stained sweater was recognized as the one he wore at the time. The assault with intent to rape was clearly manifested, but owing to Mrs. Requarth's screams for assistance, which caused him to fear detection and apprehension, he desisted from his purpose. That he did not attain his object does not relieve him of the instant charge. If at any time during the assault there was an intent on the part of the assailant to commit rape, the fact that he afterwards abandoned his purpose will not relieve him from criminal liability. (*People* v. *Guilfoyle, supra; Franey* v. *People,* 210 Ill. 206.) Upon the evidence the jury was justified in concluding that the plaintiff in error was guilty of assault with the intent charged in the indictment. It certainly cannot be said that the verdict is not supported by the evidence. This court will not disturb a verdict or reverse a judgment of conviction on the ground that the evidence is insufficient to convict unless the verdict is palpably contrary to the weight of the evidence, or the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People* v. *Bolton,* 324 Ill. 322; *People* v. *Hicketts,* 324 id. 170; *People* v. *Thompson,* 321 id. 594; *People* v. *White,* 311 id. 356.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*