(No. 18778.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. CHARLES KESSLER, Plaintiff in Error.

*Opinion filed December 20, 1928—Rehearing denied Feb. 7, 1929.*

EDWIN J. RABER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROY D. JOHNSON, (EDWARD E. WILSON, and JOHN HOLMAN, of counsel,) for the People.

Mr. CHIEF JUSTICE DEYOUNG delivered the opinion of the court:

The grand jury of Cook county indicted Charles Kessler for the voluntary manslaughter of David Smith. Kessler was tried in the criminal court of that county, found guilty by a jury and sentenced to the penitentiary. He prosecutes this writ of error for a review of the record.

David Smith, the decedent, resided with his wife at 1217 West Fourteenth street, in the city of Chicago. Charles Kessler, the plaintiff in error, lived at 1412 Blue Island avenue, in the same city, at which number his parents, Samuel and Ida Kessler, conducted a restaurant. From the prosecution's evidence it appeared that on Sunday evening, December 26, 1926, Neal Brown, Smith's brother-in-law and a lodger in his home, met Max Perlman and the plaintiff in error at the intersection of West Fourteenth street and Blue Island avenue. Perlman, addressing Brown, accused him of having in his possession some whiskey which belonged to the former. Brown denied the charge, whereupon both Perlman and the plaintiff in error struck him. Brown ran across the street with his assailants in pursuit. They overtook him and struck him again. A police squad in an automobile approached and Brown told the officers what had occurred, but in the meantime Perlman and the plaintiff in error had departed. Brown returned to his room and shortly thereafter requested Smith, his brother-in-law, and James Robinson, Mrs. Smith's step-

father, to accompany him to Kessler's restaurant to inform Perlman and Kessler, the father, that he, Brown, knew nothing about the missing whiskey. The three men, all negroes, proceeded to the restaurant and entered it. Smith and Robinson walked to the rear, near the stove, while Brown remained at the front door. The plaintiff in error, his parents and Perlman were seated around the stove. Mrs. Kessler, addressing Robinson, said that she did not want any trouble. Robinson answered that he had not come to seek trouble but merely to tell the plaintiff in error that Brown knew nothing about the whiskey and that the plaintiff in error and Perlman ought not to disturb him. Samuel Kessler, the father, arose and went to the rear of the restaurant. Perlman followed him and they met in the kitchen. The elder Kessler handed Perlman a revolver. Perlman returned to the restaurant and asked Robinson what he had in his pocket. Robinson answered, only a handkerchief, and inquired why Perlman wished to know. Perlman replied that it looked as though he was bent on mischief. Robinson promptly denied the accusation. Perlman had the revolver in his right coat pocket and walked toward the front door. At the same time the plaintiff in error approached Robinson and told him that if he did not leave, he, the plaintiff in error, would kill him. Robinson replied that he had done nothing to justify such a course. Smith was standing at the cigar counter, and as he approached the front door to open it Perlman pointed the revolver at him. A struggle between Smith and Perlman for possession of the revolver ensued and it fell to the floor. Robinson attempted to take the revolver, but the plaintiff in error seized it, shot Smith and then pointed it toward Robinson. Another struggle followed, in which Perlman gained possession of the weapon and Robinson succeeded in wresting it from him. After Smith was shot Robinson cut the plaintiff in error on the hip with a knife which he found open on the floor and which the plaintiff

in error had used in whittling a piece of wood. Samuel Kessler struck Robinson with a pick. Perlman asserted that Smith had cut him on the back of the head from ear to ear. Robinson assisted Smith from the restaurant to a confectionery store in the vicinity and the police were notified that Smith had been shot. Responding to the call, the police found Smith sitting in a chair, with his hands on his abdomen. No weapon was found on his person. He was taken to the Bridewell Hospital. Samuel Kessler was also in the confectionery store, bleeding from a wound on the left thigh. He was taken to the County Hospital. On the next day, at the Bridewell Hospital, in the presence of the plaintiff in error, Perlman, Robinson and three police officers, Smith's statement with respect to the occurrence at Kessler's restaurant was taken in writing. The officer who interrogated Smith testified, in answer to questions propounded by the trial judge, that the statement was taken in a small room; that at the time he, the officer, stood alongside of Smith's bed; that Smith spoke in a voice loud enough to be heard throughout the room; that the plaintiff in error was not more than five feet from Smith; that Smith implicated the plaintiff in error in the crime and that the latter did not deny the charge. The officer then repeated the statement, the substance of which was that Brown came to Smith's home and told him that Perlman and the plaintiff in error had accused him of buying some whiskey which had been stolen from Perlman and Samuel Kessler and that they had beaten him; that Smith, Brown and Robinson went to the restaurant and informed the proprietors that Brown did not have the stolen whiskey in his possession, and Brown asked those present why the accusation had been made; that Samuel Kessler went to the kitchen and upon his return handed a revolver to Perlman; that Perlman ordered Smith, Brown and Robinson from the restaurant, stating that he would kill them if they did not go; that Smith attempted to wrest the revolver from Perlman, and

while they were struggling for its possession a shot was fired by Perlman which struck the floor; that Perlman threw the revolver on the floor and the plaintiff in error picked it up and fired the shot which struck Smith in the abdomen; that Robinson succeeded in wresting the revolver from the plaintiff in error; that Smith procured a knife and cut the plaintiff in error with it, and that Perlman attacked Smith and the latter cut Perlman. The statement was read to Smith in the presence of the plaintiff in error. Smith signed it. The plaintiff in error did not deny the charge that he shot Smith. The revolver was afterwards surrendered to the police. It had five chambers, four of which contained loaded cartridges and the fifth had an empty shell. The coroner's findings were admitted in evidence. Robinson testified at the coroner's inquest, and, according to the record of that inquest, he stated that Perlman shot before the plaintiff in error fired and that he saw Smith cut Perlman with a large knife. On the trial Robinson denied that he had made these statements at the coroner's inquest.

The evidence in defense tended to show that on the evening in question Perlman and the plaintiff in error were seated near the stove in the restaurant when Brown entered and asked that a dollar be changed into coins of smaller denominations. The plaintiff in error conveyed the request to his mother. She was in a rear room but came into the restaurant and said she was sorry that she was unable to make the exchange. Brown opened the front door and admitted Smith and Robinson. They had their hands in their pockets, walked toward the rear of the restaurant and ordered those present to move backward. The plaintiff in error retired a short distance. Fearing trouble, Perlman sought to call certain police officers he had seen in the street, but when he reached the front door and attempted to open it Brown held the door from the outside. Perlman started for a window at the left of the door, but before reaching

the window Smith jumped on him, cut him in the back and neck and knocked him down. The plaintiff in error attempted to run outside to call police officers, but he was cut in the head by Smith and Robinson. The latter also cut him in the back. A shot was fired. Perlman had regained his feet and stood near a cigar case, calling for help. The plaintiff in error was lying on the floor. His father asked Robinson to stop the attack, but the latter did not desist. The elder Kessler tried to reach the telephone but was intercepted by Smith, who cut him in the head. Kessler pursued Robinson but fell, and Smith jumped on him and cut his leg. Mrs. Kessler went to the aid of her son and was cut in the head and chest. After the encounter Smith and Robinson left the restaurant. Perlman pursued them for a short distance and went to a drug store. Samuel Kessler, the father, caused the police to be notified, and he was at the confectionery store when the officers arrived. His wife, Perlman and the plaintiff in error were conveyed to the County Hospital, and police officers took him to the same institution.

The only person not a participant possessing any knowledge of what had taken place was Abe Moskwitz, a manufacturer of soft drinks. He supplied Kessler's restaurant with his products and called at the restaurant on the evening in question to collect some money owing to him. Seeking to gain entrance, a negro who stood at the door told him to leave. Moskwitz saw two other negroes, both strangers to him, leave the restaurant and run down West Fourteenth street. Perlman left the building and was bleeding. The man who held the door ran into an alley.

Two or three days after the encounter, Perlman, Robinson and the plaintiff in error were taken to the Bridewell Hospital and Smith was asked whether he was acquainted with Perlman, and he answered, "If that is Max, he shot me." Perlman was afterwards taken to another hospital, where he remained four weeks.

The testimony of the witnesses for the prosecution that Perlman and the plaintiff in error met Brown at the intersection of West Fourteenth street and Blue Island avenue and held a conversation with him concerning the theft of whiskey; that Samuel Kessler gave Perlman a revolver and the latter fired a shot; that the plaintiff in error had a knife with which he had been whittling; that Robinson was struck with a pick, or that the plaintiff in error ordered Brown, Smith and Robinson to leave the restaurant, was specifically denied. The only revolver which the witnesses for the defense saw was the one Robinson had in his hand. The gunshot wound which Smith suffered caused peritonitis, and he died on January 6, 1927.

For a reversal of the judgment, the plaintiff in error makes the contention, among others, that the trial court erroneously admitted in evidence the testimony of the police officer that Smith at the Bridewell Hospital stated that the plaintiff in error had shot him, and that the plaintiff in error, who was present when the statement was made, did not deny the charge. This testimony was admitted on the theory that the failure of the plaintiff in error to deny the accusation was an admission of its truth. An admission may be implied from the conduct of a person charged with the commission of a crime who remains silent when another states in his hearing that he was concerned in its perpetration, where the statement is made under circumstances which allow him an opportunity to reply and under which persons similarly situated would ordinarily deny the imputation. (*People* v. *Ross,* 325 Ill. 417; *People* v. *Nitti,* 312 id. 73; *People* v. *Wilson,* 298 id. 257.) The plaintiff in error, it appears, heard and understood Smith's accusation. It was made by a person and under circumstances which naturally would call for a reply if untrue. Whether the charge was true was within the knowledge of the plaintiff in error and he was at liberty to make a reply. The silence of the plaintiff in error was a circumstance having a tend-

ency to show that he admitted the truth of the accusation. The probative force of that circumstance it was the jury's province to determine.

It is further contended that questions asked Brown with respect to the charge alleged to have been made by Perlman and the plaintiff in error that Brown possessed stolen liquor, and a like question asked the plaintiff in error on cross-examination, had a tendency to cause the jury to believe that the latter was engaged in the liquor traffic in violation of law, and hence that these questions were prejudicial to him. No such inference is justified. When Brown testified that Perlman charged him, early in the evening of the day Smith was shot, with the possession of stolen whiskey, no objection was interposed. Both Perlman and the plaintiff in error denied that they met Brown or had any conversation with him at the time in question. It is not apparent how the plaintiff in error was prejudiced by the questions of which complaint is now made.

The third and fourth instructions given at the prosecution's request, it is argued, were erroneous. The third instruction was a repetition of section 143 of the Criminal Code, viz.: "Manslaughter is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, or involuntary in the commission of an unlawful act, or a lawful act without due caution or circumspection." (Cahill's Stat. 1927, p. 909; Smith's Stat. 1927, p. 973.) The complaint is, that since the indictment charged voluntary manslaughter, only, the instruction led the jury to believe that proof of either voluntary or involuntary manslaughter could be made, and hence that the instruction was misleading. Instructions should not only state the law correctly but should be applicable to the case presented. (*People* v. *Jones,* 313 Ill. 335; *People* v. *Corbishly,* 327 id. 312.) Whether the

giving of an instruction in the language of the statute is misleading will depend upon the facts of the particular case. (*People* v. *Pargone,* 327 Ill. 463; *People* v. *Crane,* 302 id. 217; *People* v. *Battaglia,* 282 id. 91.) The jury found the plaintiff in error guilty of voluntary manslaughter. Obviously, the jury were not misled by the instruction.

The fourth instruction was in the language of section 144 of the Criminal Code, which amplifies the definition of voluntary manslaughter. The objection made to the instruction is that it did not permit the jury to consider that the plaintiff in error might have acted in self-defense or in the defense of his habitation. He interposed neither of these defenses. His defense was that he had not shot Smith. The prosecution sought to establish that he had, and it was entitled to instructions upon the law with respect to its theory of the case. When such instructions correctly state applicable propositions of law, they may be given although they have no application to the case on the theory of the defense. (*People* v. *Andrews,* 327 Ill. 162; *People* v. *Priddy,* 327 id. 50.) If the evidence had been available and the plaintiff in error had desired to show that he acted in self-defense or in the defense of his habitation he could have done so, and in either event could properly have asked for appropriate instructions. Where self-defense is not relied upon at the trial of an accused person it is improper for the State to submit instructions relating to that defense. (*People* v. *Smith,* 254 Ill. 167; *Healy* v. *People,* 163 id. 372.) The fourth instruction was not prejudicial to the plaintiff in error.

Complaint is made of the trial court's refusal to give the jury two instructions which· the plaintiff in error requested. The first concerned the testimony of an accused person. A correct instruction upon the same subject was given at the request of the prosecution, and repetition was unnecessary. It is not error to refuse an instruction the substance of which has been given in another. (*People* v.

*McKinnie,* 328 Ill. 631; *People* v. *Cash,* 326 id. 104; *People* v. *Mason,* 301 id. 370; *People* v. *Andrews, supra.*) The other refused instruction contained the statement, "the court instructs the jury that a verdict of not guilty means no more than this: that the guilt of the accused has not been demonstrated in the precise, specific and narrow forms prescribed by the law." Demonstration of the guilt of an accused person is not required and the forms to which reference is made were not defined. The instruction afforded the jury an opportunity for conjecture or speculation, and it was properly refused.

The plaintiff in error contends that the evidence fails to show, beyond a reasonable doubt, that he fired the fatal shot. The prosecution answers that the evidence amply sustains the charge laid in the indictment and that the jury's verdict upon that question is conclusive upon this court. Practically all of the material evidence in the instant case is in conflict. Much of it is irreconcilable. Whether Brown was beaten by Perlman and the plaintiff in error before they met in the restaurant; who were the aggressors and produced the weapons by which the several injuries were inflicted; who did the shooting and the number of shots that were fired and who caused the knife wounds, were questions, among others, upon which the witnesses for the prosecution and the defense differed essentially. The law has committed to the jury the determination of the credibility of the witnesses and of the weight of their testimony, and where the evidence is conflicting this court will not substitute its judgment for that of the jury. A verdict of guilty, however, is not conclusive of the sufficiency of the evidence to sustain a conviction, and it is the right and duty of this court, on review, to set the verdict aside if satisfied, from a consideration of all the evidence, that there is a reasonable doubt of the defendant's guilt. (*People* v. *Hoffman,* 329 Ill. 278; *People* v. *Elmore,* 318 id. 276; *People* v. *Freeland,* 284 id. 190; *People* v. *McMahon,* 254 id. 62.) There was

in this case sufficient evidence to convict, and it cannot be said that the verdict is palpably contrary to the weight of the evidence, or that the evidence is so unreasonable, improbable or unsatisfactory as to justify a reversal of the judgment on that ground.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*