**The People of the State of Illinois, Plaintiff-Appellee, v. Willie Dorsey, Defendant-Appellant.**

**Gen. No. 51,777.**

First District, Fourth Division.

September 6, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty, Assistant Public Defender, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and E. R. Hersey, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSE CHARGED
Murder.[1]

DEFENSE AT TRIAL
Self-defense.[2]

JUDGMENT
After a jury trial, defendant was found guilty and was sentenced to a term of 14 to 20 years.

CONTENTIONS ON APPEAL
(1) Defendant was not proven guilty beyond a reasonable doubt.

(2) The State's Attorney made prejudicial misstatements during his opening statement to the jury.

(3) The jury was erroneously instructed.

---

[1] Ill Rev Stats (1965), c 38, § 9-1:

Murder

(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

    (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

    (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

    (3) He is attempting or committing a forcible felony other than voluntary manslaughter.

[2] Ill Rev Stats (1965), c 38, § 7-1:

Use of Force in Defense of Person

A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily

EVIDENCE

*Ralph McCullough,* for the State.

On August 11, 1965, defendant, decedent (Fred Butler), William Charles Enis and the witness were in a tavern drinking. An argument arose between decedent and defendant. They wrestled for a while, stopped, and had another drink.

> Then they started wrestling again. I don't know if they were angry at each other; they did that all the time, I don't know.
>
> Then Fred picked up a stick and was going to hit the defendant with it. Fred said, "I will blind you for life." He was holding the stick in his hand. It was a two-by-four. I grabbed Freddie Butler by his arms. Freddie was still holding the stick. After I grabbed him, his arms were down at his side. I grabbed his arms down by the wrist part. The stick was still in his hand. One part of it was on the ground and the other end was in his hand. That is when Willie came up and shot him.
>
> Q. And where did Willie shoot?
> A. He shot over my right shoulder.
> Q. And by that you mean Willie Dorsey?
> A. Yes, sir.
> Q. And where did the shot go?
> A. It went over my left shoulder and hit Freddie Butler. It hit Freddie Butler in the left chest. Then Fred made about ten steps and laid the stick on the bench and then he started throwing up blood and I grabbed him.
>
> . . . . . .

harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony.

261

Just before Willie shot Freddie, Fred said, "I will blind you for life." Willie said, "Don't do that." He did not say anything about killing him. After he shot Freddie, he stood there and looked at him and said, "Die, nigger." Then he left and Freddie Butler died. The police came and took the body away.

. . . . . .

We had quite a bit (of liquor to drink); we had about two or three bottles. Mr. Butler got shot in the alley. We were drinking in the alley. The patio in back of the poolroom is in the alley. Mr. Butler did not back the defendant up against a wall with the two-by-four. He did not tell the defendant that he was going to kill him with the two-by-four. He did have the two-by-four in his hand. The defendant came behind my back. They was facing each other, but I was in between them. The gun was right beside my right shoulder.

Defendant was "an acquaintance" of the witness; decedent was a closer friend. They all "ran around together." Before the killing they were all good friends.

The witness didn't see anybody else in the alley or patio behind the poolroom other than the persons named.

*William Charles Enis,* for the State.

He was one of the group with defendant on August 11, 1965. He had gone drinking with them on other occasions. On those occasions there had been "scuffling and tussling." There had been a little "confusion" earlier in the evening; "they started pushing and scuffling."

At about eight-thirty in the evening we were sitting in back of the poolroom drinking. As I said before, they had been scuffling, tussling and pushing. Then all of a sudden Fred asked me to pass him a stick. I said I wouldn't so he asked Ralph. Ralph

262

said he wouldn't. So he walked around behind the bench to get the stick himself and then to told Willie that he was going to blind him, you know, put his eyes out, beat his head flat like a biscuit. So Ralph got up to stop him. Ralph told him that was wrong. At this time Willie Dorsey was sitting on the bench.

. . . . . .

After Dorsey left my side, he got up and then all of a sudden there was a shot fired. I saw him fire the shot. Willie fired it.

. . . . . .

Q. Now, at the time Mr. Dorsey fired the shot, what was Ralph McCullough doing?

A. He was over by Fred.

Q. Did you see what he was doing near Fred?

A. He was standing in front of him.

Q. He was standing in front of him. Was he holding Fred's arms, did you see?

A. He was trying to restrain him I suppose.

Q. Did you see anything in Fred's hands?

A. Yes, he had a stick there.

. . . . . .

The stick he had was a piece of stock about this long (indicating), and it had six nails in it, two at each end and two in the middle. They were sticking out. . . . When he got shot he still had the stick in his hand. Mr. McCullough was between me and the deceased at the time of the shot, because I was sitting on the bench and they was out towards the alley-way, over by the fence. . . . The bench was about 10 or 15 feet from the fence.

. . . . . .

I really couldn't say how long Dorsey sat there before he walked up and fired the shot. I couldn't

approximate. We didn't know because the thing happened so fast.

Q. But he was sitting on the bench and then walked over?

A. He was sitting on the bench and he got up, yes.

*Edward Scott, Jr.,* for the State.

He was the F. B. I. Agent who arrested defendant in Chicago more than three months after the killing. Defendant was arrested pursuant to a warrant for unlawful flight to avoid prosecution for the murder of the decedent.

*Stipulation.*

A toxicologist's report would indicate that decedent was under the influence of intoxicating liquor at the time he was shot to death.

*Leroy Buie,* for the defense.

He had never told his story to the police. However, he explained his presence as a witness at the trial by relating that he had met defendant's wife in a tavern a couple of weeks before, and in conversation he told her that he had seen the shooting. At her urging he told his story to defendant's attorney.

On the evening of the incident, he cut through the alley on his way to Lake Street and saw four men. He didn't know any of them. One man was "going at" the other with a stick, cursing.

> The man with the stick was walking towards this man and this man was backing along Lake Street [sic] and he was walking toward him with the stick. . . . It took about three or four or five minutes for this man advancing with the stick to go this five or six feet before he was shot. . . . When I first saw the man with the stick advancing on the other man, he was about six or eight feet away from him. That is the furthest he was away from him.

. . . . . .

264

There were garbage cans all up the alley. Nothing interfered with my vision, just a little bit, it was getting dusk out, late in the evening. I observed this for about three, four, five, six minutes.

Suddenly a shot went off. Two of the men ran. The other caught the fourth man and eased him to the ground. He (Buie) was about 75 to 100 feet away and was not able to see the person who fired the shot—only his "shadow."

> . . . The person who fired the shot backed up towards Lake Street, back up against the wall, and the guy was walking on him with the stick and this guy said something like, I wasn't too familiar, you know, with what he said, I was a little too far off but anyway he was cursing this guy. He said, "I am going to do something I should have did to you a long time ago," and he called him a name, and I heard him say, "I am going to blind you, I am going to beat your brains out," or something, but when they were gone I left.

> . . . . . .

> . . . I ran back west through the alley and come out on Lake Street and I was going to call the police at the time but by the time I made it around the corner the fire department was there first, I am pretty sure, and the alley was full of police.

> . . . . . .

> I did not go up and talk to any of the policemen. I went home. I told people about what I had seen; we was talking about it. I just talked to the guys around the street. I did not talk to any of the policemen.

*Defendant*

At about 6:00 p. m., August 11, 1965, he met Ralph McCullough at a tavern and they drank. About 45 minutes

later, they went to an alley patio behind the pool hall where they sat on a bench and conversed. After a few minutes Chuck Enis and Fred Butler (the decedent) arrived. He and Fred got into a dispute over a bottle of wine which Fred took from him and drank.

. . . Well, was about five minutes passed, so he gets into it about something else. He tells me not to say nothing, so this is what gets us back into it again I guess, I don't know, and I said something and he said, he started putting on his gloves and I say, "What you doing that for?" Well, "We fight, you know." So I say I don't want to fight because I don't know what we fighting about. So he started putting on his gloves. I jumps up off the bench and I grabs his wrist and he tears the gloves off his hand, skin-tight gloves. He tears them off his hands and he comes out of them and so I say, "All right," you know, and I throws up my dukes. So nothing happens. He backed down. So I goes back over to the bench and sits back down. I think it's over with. He walks down the alley and I think he's gone. So I'm talking to Chuck and Chuck is sitting besides me on the bench talking. I forgot all about it. Then Fred comes back up with this two-by-four with nails in it. He's standing about from here to the table there and he says, "I'm going to blind you." So I jumps up off the bench again and when I jump up Chuck jumps up and they jump, everybody jumps up. They jumps back into the doorway, the pool hall doorway. I start backing along the bench to the door. Then he start coming at me. Well, I didn't know what to do then. They are standing in the door and I don't know whether to break and run or what to do. I got this pistol in my pocket, I know I got it. I don't want to pull it out. I don't want to hurt him. So he comes over to me. I pulls it out. Ralph, he

266

runs by and the shot went off. When the shot went off I tell Chuck to go over to the fire house and get the ambulance and he takes off and Fred was losing a lot of blood from the mouth, so I gets scared and I run. I runs down the alley and I runs and catches the bus and I goes downtown, get on the Greyhound and go out of town. Three months later I comes back and the F. B. I. picked me up.

Defendant described his relationship with decedent by saying that they were not enemies, and continued:

He is a fellow that I would see up around that corner a number of times. I drank with him. I did not wrestle with him or sparred around. I don't play like no kids. We wasn't playing, we had a fight once before, maybe six months.

Defendant's testimony on cross-examination was substantially the same as on direct. He concluded:

He had the stick in his hand, about like this. He was holding it out in front of him and he said, "I'm going to blind you." I don't know what angle the stick was. He had it down like this. He shook it at me a couple of times. He told me he was going to blind me, see, so this shook me up. He told me too, he says, "Well, I should have got you before," I think he had something against me but I don't know what. Well, he said, "I should have got you before but I am sure going to get you now," and that kind of shook me up, see. That part is why I moved. Before that I wouldn't get up. It never worried me before. Ralph was standing back by the door. See, they gave us room. Ralph didn't touch Freddie at all. He came between us when I shot. When I came out, Ralph moved over. He didn't grab him before and tell him not to do it. Didn't nobody say nothing, nobody was

saying nothing, it was quiet as a mouse. The gun was in my back pocket. I reached for it with my right hand. When I reached for it, I came up around the shoulder. It went off. I was intending to fire the pistol because I thought he was going to hit me. I didn't know if he grabbed the gun or what. But I pulled the trigger. Ralph run in between us. I don't know if it was before I fired or what.

OPINION

(1) Defendant contends that the State failed to prove beyond a reasonable doubt that he committed the crime of murder. He concedes that he intended to shoot decedent and that he killed him, but argues that the State failed to meet its burden of proving that the killing was not justified in self-defense.

As can be seen from a review of the evidence, there was considerable conflict in the testimony, particularly in regard to the position and actions of McCullough just before the shooting. The jury obviously decided the question of credibility in favor of the State's witnesses, and that determination will not be set aside by us under the circumstances of this case. We have therefore examined the evidence in detail primarily to ascertain whether it furnishes support for the jury's verdict.

■ We find that it does, and that there was ample testimony to support the conclusion that it was unreasonable for defendant to have believed (if he really did) that deadly force was necessary to prevent imminent death or great bodily harm. McCullough had imposed restraint upon decedent; decedent's wrists were held; his arms were pinned to his sides; the spiked end of his cudgel rested on the ground. McCullough had placed his body between decedent and defendant, and defendant was thus insulated from immediate peril. At that moment (according to testimony which the jury could reasonably have believed), defendant walked ten or more feet to McCullough's back, reached over his shoulder, neces-

sitating his holding the pistol in an awkward position, and shot decedent point blank in the left chest. Such conduct evidences a mind bent on revenge or retaliation rather than on extrication from reasonably apparent danger. People v. Thornton, 26 Ill2d 218, 186 NE2d 239.

Also consistent with the necessary mental state for murder was the evidence that defendant and decedent had been fighting earlier that evening and on other occasions, that defendant had considered himself wronged in the episode of the wine bottle, and that, standing over his dying victim, defendant had said, "Die, nigger."

(2) Secondly, defendant contends that the State's Attorney, in his opening remarks to the jury, misstated certain facts, the effect of which was so prejudicial as to render the entire trial unfair. In his statement, the prosecutor asserted his belief that the evidence would show that there was a period of three to five minutes between the time when decedent picked up the stick and the time of the shooting; and that defendant fired three shots at decedent. He then corrected himself as to the number of shots, saying that the evidence would show only one shot, not three.

The testimony of defendant's witness fully supported the statement as to the elapsed time of the incident, and there was a timely correction on the number of shots. We find no prejudice as to either statement.

■ (3) Defendant also contends that the court erred in giving a State's instruction on the subject of voluntary manslaughter (Ill Rev Stats (1965), c 38, § 9–2(a)) and in permitting the jury to consider a manslaughter verdict. In our opinion the court acted properly, since there was evidence which could have justified the conclusion that decedent's assault evoked a "sudden and intense passion" in defendant. See People v. Kessler, 333 Ill 451, 164 NE 840; 4 Blackstone's Commentaries (7th ed) 191; Perkins, The Law of Homicide, 36 J of Cr L

and Crim 391 at 412–422 (1946) ; and People v. Taylor, 36 Ill2d 483, 488, 224 NE2d 266.

█ Finally, defendant contends that the court erred in refusing his tendered instruction that the presumption of defendant's innocence remains with him throughout every stage of the trial and that the burden of proof never shifts from the State. One of the given instructions fairly and adequately cautioned the jury about substantially the same matters. It was therefore not error for the court to have refused defendant's instruction. People v. Miller, 74 Ill App2d 356, 359, 220 NE2d 1.

DECISION

The judgment of the Circuit Court is affirmed.

Affirmed.

McCORMICK, P. J. and DRUCKER, J., concur.